Gb3nval1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ALEJANDRO VALLE, EDGAR CID,

                    Plaintiffs,

          v.                              15 Civ. 2005 (GWG)

GORDON CHEN'S KITCHEN, *et
al.*,,

                    Defendants.

------------------------------x

                                      New York, N.Y.
                                      November 3, 2016
                                      10:00 a.m.

Before:

                    HON. GABRIEL W. GORENSTEIN,

                                      U.S. Magistrate Judge

                         APPEARANCES

MICHAEL FAILACE & ASSOCIATES, P.C.
     Attorneys for Plaintiffs
BY:  SHAWN R. CLARK

NATHAN M. FERST
     Attorney for Defendants

ALSO PRESENT:

Nicholas Luttinger, Interpreter (Spanish)
Marcia Gotler, Interpreter (Spanish)

Gb3nval1

1          (Case called)

2          MR. CLARK:  Shawn Clark of Michael Faillace &

3     Associates, for the plaintiffs.

4          Also at counsel's table with me is Mr. Humberto

5     Alvarez, who is a paralegal with our office, Mr. Nick

6     Luttinger, who is one of the certified translators we have

7     today, as well as the plaintiffs, Mr. Cid and Mr. Valle.

8          There is also an additional certified translator,

9     Marcia Gotler, who is going to be also serving to translate.

10         I think we still have some issues with arranging where

11    people are going to sit and the like for translation purposes

12    but good morning, your Honor.

13         THE COURT:  Good morning.

14         MR. FERST:  Good morning, your Honor, Nathan Ferst for

15    defendants Gordon Chen's LLC, Mac-War Restaurant Corp. and

16    Allan Wartski.

17         THE COURT:  Do you want to introduce any other people?

18         MR. FERST:  Yes.  Jeffrey Reed, the paralegal of my

19    office, is sitting next to me the defendant, Allan Wartski is

20    sitting next to him, and the manager of the defendant entity,

21    Mr. Pedro Garzon, is sitting next to him.

22         THE COURT:  Welcome, everyone.

23         One moment.

24         THE INTERPRETER:  I would like to verify that this

25    courtroom is not equipped with electronics for earphones for

Gb3nval1

1    the plaintiffs to be able to hear simultaneous through the

2    interpreter's mic.

3            THE COURT:  We don't have earphones.  There are some

4    courtrooms that do.

5            THE INTERPRETER:  OK.

6            THE COURT:  It is possible that it could be set up in

7    that way, but we have to request it.

8            THE INTERPRETER:  I am loath to have you spend extra

9    time doing that.  The only remedy for that is one which would

10   be far short of perfect, which would be to have the plaintiffs

11   sitting in the jury box, the interpreters, myself and my

12   partner, could position ourselves behind them in the middle.

13           THE COURT:  That is fine.

14           THE INTERPRETER:  That can be sort of intrusive

15   because we can't speak as quietly as we normally would.

16           THE COURT:  What would be the problem, if your

17   paralegal didn't mind moving back, with the two plaintiffs

18   sitting there and you sit behind them there.

19           Wouldn't that be the same?

20           THE INTERPRETER:  The idea is I should be as close to

21   the speakers possible.

22           THE COURT:  Why don't you have the two of them sit

23   right here, and then you are right behind them.

24           THE INTERPRETER:  We can try that.

25           THE COURT:  Why don't you do that.

Gb3nval1

1          THE INTERPRETER:  That is fine.

2          I don't want to encroach on the space here.

3          THE COURT:  Put the two plaintiffs next to their

4    attorney.

5          THE INTERPRETER:  OK.  And I need to pull up a chair

6    here.

7          THE COURT:  All right.

8          Mr. Clark, if you wish you to make an opening

9    statement it is up to you.

10         MR. CLARK:  I don't think opening statements will be

11   necessary.  One issue that I did want to resolve was I heard

12   from defense counsel that the court reporter's office was

13   curious whether or not there would be expedited posttrial

14   briefing in the case, in which case we would need to order the

15   transcripts faster, and we would need to notify them.

16         Certainly I would prefer, rather than doing opening

17   and closing statements, that we simply do some posttrial

18   briefing.  I think there are some issues that need to be

19   clarified through such briefing.

20         THE COURT:  Speak up a little.

21         MR. CLARK:  That would be need to clarified through

22   such briefing, and I need to clarify the schedule for that.

23         THE COURT:  I am not in a rush.  So whatever schedule

24   you two want is fine with me.

25         MR. CLARK:  Thank you, your Honor.

Gb3nval1

1          I think that resolves that issue.

2          MR. FERST:  It does.

3          Thank you.

4          THE COURT:  Did you want to say anything, Mr. Ferst,

5    before we start?

6          MR. FERST:  No.  Thank you, your Honor.

7          THE COURT:  I assume this is just the question of

8    hours works that is really the disputed issue here.

9          MR. CLARK:  Yes, your Honor.  The hours worked.

10   Certainly I think there is some notice, and 80/20 issues and

11   the like.

12         THE COURT:  Notice and?

13         MR. CLARK:  80/20 issues.

14         Whether or not the proportion of nontip work performed

15   by each of these delivery workers was so much as to overcome

16   the entitlement to a tip credit, which would potentially be

17   moot if the --

18         THE INTERPRETER:  I'm sorry, Mr. Clark.  I am over

19   here behind you.  I have no earphones.

20         MR. CLARK:  My apologies.

21         -- potentially be moot if the notice issue is resolved

22   in plaintiffs' favor, but nevertheless it will be explored in

23   the examination.

24         The only other issue I did want to note for your Honor

25   is I do believe that there is one nonparty witness in the case,

Gb3nval1                        Cid - direct

1   Mr. Garzon, and we would make an application that he be

2   excluded for the testimony of the parties.

3            MR. FERST:  I disagree with counsel.  Mr. Wartski is

4   being sued individually.  Mr. Garzon is here as a

5   representative of the corporate defendant.  So I believe that

6   both of them have the right to be in the courtroom.

7            THE COURT:  It seems perfectly correct, unless there

8   is something I am missing, Mr. Clark.

9            MR. CLARK:  Understood, your Honor.

10           It's been unclear exactly what purpose this particular

11   nonparty defendant was serving, and if he's being represented

12   as a witness on behalf of the corporate defendant.

13           THE COURT:  I think he's not the witness.  He's the

14   representative.

15           MR. CLARK:  As a representative, yes, your Honor.

16           THE COURT:  All right.  Mr. Clark, you can call your

17   first witness.

18           MR. CLARK:  The plaintiffs called Mr. Edgar Cid to the

19   stand.

20    EDGAR CID GONZALEZ,

21       a Plaintiff herein,

22       having been duly sworn, testified as follows:

23           (Through interpreter)

24   DIRECT EXAMINATION

25   BY MR. CLARK:

Gb3nval1                    Cid - direct

1          THE COURT:  Hold on.  Placement.  I don't want

2   people's view blocked.

3          MR. CLARK:  OK.

4          THE COURT:  Do you want to move the lectern.

5          It may come apart as you do it, but see what happens.

6          MR. CLARK:  I'm gliding it.

7          THE COURT:  OK.

8          MR. CLARK:  Thank you, your Honor.

9   BY MR. CLARK:

10  Q.  Good morning, Mr. Cid.

11  A.  Good morning.

12  Q.  How old are you?

13  A.  I am 29 years old.

14  Q.  And what is the highest education that you have received?

15  A.  College.

16  Q.  Where was that?

17  A.  In Mexico.

18  Q.  And what is your first language?

19  A.  Spanish.

20  Q.  Do you write in Spanish?

21  A.  Yes.

22  Q.  Can you read in Spanish?

23  A.  Yes.

24  Q.  Do you speak any English?

25  A.  A little bit.  Not very much.

Gb3nval1                          Cid - direct

1   Q.  Can you read in English?

2   A.  A little bit.

3   Q.  Can you write in English?

4   A.  Very little.

5   Q.  Did you ever work for a restaurant called Hakata?

6   A.  Yes.

7   Q.  What is Hakata?

8   A.  It is a Japanese restaurant.

9   Q.  Where is Hakata located?

10  A.  At 232 East 53rd Street.

11  Q.  When did you first start working at Hakata?

12  A.  Approximately from September of 2008 through March of 2014.

13  Q.  And how did you find your job at Hakata?

14  A.  A friend of mine that was working there told me that they

15  needed people there.

16  Q.  And then what did you do with that information?

17  A.  I went to that restaurant, the one that's located at 252

18  East 53rd Street, and I spoke with the chef, Chin, and he's the

19  one who hired me.

20  Q.  Who is Chin?

21  A.  He was the chef for kitchen.

22  Q.  And were you offered a job at that time?

23  A.  Yes.

24  Q.  What job were you offered?

25  A.  Delivering the food.

1   Q.  And at that time were your duties described to you?

2   A.  No.

3   Q.  Were you told what your schedule was going to be?

4   A.  Yes.

5   Q.  What was your schedule at that time?

6   A.  My schedule was Monday through Saturdays, from 10:30 to 4

7   until 10:30 at night, and from 6 to 10:30 p.m.

8   Q.  And was this the schedule that you found yourself actually

9   working when you started working at Hakata?

10  A.  Yes.  For a period of time, and afterward they changed it.

11  Q.  When was the first time they changed it?

12  A.  It was approximately from September -- no, from March 2009

13  through October 2010.

14  Q.  OK.  So you are saying that your schedule changed in

15  October of 2010, if I understand your testimony correctly?

16  A.  Yes.  It changed to working only from Monday through

17  Friday, because it was closed on Saturdays.

18          THE COURT:  Mr. Cid, I am a little confused.

19          You said that you started in September 2008.

20          Is that correct?

21          THE WITNESS:  No, it was September of 2008.

22          THE COURT:  OK.  You were told a certain schedule at

23  that time, is that right?

24          THE WITNESS:  Yes.

25          THE COURT:  That schedule was 10:30 to 4 and 6 to

Gb3nval1                          Cid - direct

1    10:30?

2              THE WITNESS:  (In English) Yeah.

3              THE INTERPRETER:  The witness answered before the

4    interpretation, yes, in English.

5              THE COURT:  When did that schedule change?

6              THE WITNESS:  At the point where they closed on

7    Saturdays.

8              THE COURT:  When was that?

9              THE WITNESS:  In March of 2009.

10             THE COURT:  And how did the schedule --

11             THE WITNESS:  Through October of 2010.

12             THE COURT:  And how did the schedule change in that

13   period?

14             THE WITNESS:  I was only working from Mondays through

15   Fridays.

16             THE COURT:  And what were the hours in the period from

17   March 2009 to October 2010?

18             THE WITNESS:  They were the same.  They were the same

19   delivering food.

20             THE COURT:  Now, Mr. Clark, you were about to ask what

21   happened in October of 2010?

22             MR. CLARK:  Yes.

23             THE COURT:  Go ahead.

24   BY MR. CLARK:

25   Q.  What change happened in October 2010?

Gb3nval1                        Cid - direct

1    A.  I began working only from Mondays to Fridays because they

2    were closed on Saturdays.

3    Q.  OK.  To clarify, I believe, and this might have been

4    confusion in translation or something, but you just testified

5    that you started working only five days a week earlier than

6    October of 2010.  Is that right?

7    A.  No.  Perhaps I made a mistake.  I was working the six days

8    up until 2010.

9    Q.  OK.  So you were working the six-day schedule that you

10   described --

11   A.  Yeah.

12   Q.  -- up until 2010.

13            When in 2010?

14            THE INTERPRETER:  I'm sorry.  We can't talk at the

15   same time.  I was interpreting, and you were continuing.

16            MR. CLARK:  OK.

17            THE INTERPRETER:  You need to repeat the question.

18            Sorry.

19            THE COURT:  That's OK.  I have a question.

20            What happened in March 2009, if anything?

21            THE WITNESS:  There was a change in the hours.

22            THE COURT:  What was the change?

23            THE WITNESS:  The only change was that there was one

24   day that I didn't work.  They were closed on Saturdays.

25            THE COURT:  When did that start happening?

1           THE WITNESS:  In March of 2009 until October of 2010.

2           THE COURT:  What happened in October 2010?

3           THE WITNESS:  That's when I began to work from Mondays

4  through Fridays.

5           THE COURT:  Go ahead, Mr. Clark.

6  BY MR. CLARK:

7  Q.  I know we spent some time on this, but it sounds like

8  that's the same thing.  Is that right?

9  A.  I'm confused.

10  Q.  OK.  Well, when you started working, you testified that you

11  worked from Monday through Saturday, right?

12  A.  (In English)  Yeah.

13  Q.  At some point you've testified that your schedule changed

14  to only five days per week.

15  A.  That's exactly it.

16  Q.  But it also sounds like you have testified that that change

17  happened on multiple different dates.  When did your schedule

18  change to only five days per week?

19  A.  It changed to working for five days only during the period

20  from March 2009 through October of 2010.

21           THE COURT:  Mr. Interpreter.

22           THE INTERPRETER:  2011 for deliveries.

23           THE COURT:  OK.  I ask that you repeat -- could you

24  repeat your answer, please.

25           THE WITNESS:  The change to five days occurred from

Gb3nval1                        Cid - direct

1    October 2010 to October 2011.

2              THE COURT:  Mr. Interpreter.

3              THE INTERPRETER:  Yes.

4              (Discussion off the record)

5              THE INTERPRETER:  The interpreter corrects himself.

6    It changed from --

7              THE COURT:  I am going to ask him to repeat.

8              Sir, could you repeat your answer.

9              THE WITNESS:  Yes.  The schedule changed to five days

10   from March of 2010 to October of 2011.

11   BY MR. CLARK:

12   Q.  OK.  What changed in October of 2011 about your schedule?

13   A.  Could you repeat the question, please.

14   Q.  You said that the change happened until 2011.  What changed

15   in 2011?

16   A.  At that point I began to work from 10:30 in the morning

17   until 4 in the afternoon, and then from 6 in the evening to

18   10:30 at night.

19   Q.  Did your schedule ever change again after that?

20              THE COURT:  Wait.

21              How many days per week?

22              THE WITNESS:  Five days a week from Monday through

23   Friday?

24              THE COURT:  And that change happened in October 2011?

25   Is that what you are saying?

Gb3nval1                      Cid - direct

1              THE WITNESS:  Yes.

2              THE COURT:  What was happening before October 2011 in

3  terms of your hours and days?

4              THE WITNESS:  Before 2011?

5              THE COURT:  October 2011.

6              THE WITNESS:  Oh, at that point I was working Monday

7  through Saturday, six days a week from 10:30 in the morning

8  until 4 in the afternoon and from 6 in the evening until 10:30

9  at night six days a week.

10             THE COURT:  Keep going, Mr. Clark.

11  Q.  Did your schedule ever change again after that change to

12  your hours that you just described?

13  A.  No.

14  Q.  Now, when you first started at Hakata, did you have to

15  record when you came in in the mornings?

16  A.  No.

17  Q.  And when you first started at Hakata, did you have to

18  record when you would leave at the end of each day?

19  A.  No.

20  Q.  Did this ever change during your employment at Hakata?

21  A.  There was a certain period of time just for a month, and

22  then beyond that, no.

23  Q.  And when was this month?

24  A.  Approximately March of 2012.

25  Q.  What did you have to do to record when you came in and left

Gb3nval1                         Cid - direct

1   during this month?

2   A.   The manager, who was Mr. Pedro Garzon, he gave us a number

3   that we had to punch in.

4   Q.   And just to clarify, who was Pedro Garzon?

5   A.   He's the manager of the restaurant.

6   Q.   And what did he do at the restaurant?

7            What did he do at the restaurant?

8   A.   He took the orders.

9   Q.   Anything else?

10  A.   And packed.

11  Q.   Anything else?

12  A.   No.

13  Q.   And how long has Pedro Garzon been the manager at Hakata in

14  your experience?

15  A.   He was there from 2010 until I left in March of 2014.

16  Q.   All right.  When you were first hired at Hakata, were you

17  told what you would be paid?

18  A.   Yes.

19  Q.   And what were you told?

20  A.   I was told that I would be paid 4.65 per hour.

21  Q.   And was that what you were being paid when you first

22  started at Hakata?

23  A.   Yes.

24  Q.   And 4.65 per hour, was that dollars or something else?

25  A.   No, it was in dollars.

Gb3nval1                          Cid - direct

1   Q.  And who would pay you when you first started at Hakata?

2   A.  The chef, Chin.

3   Q.  And how often would he pay you?

4   A.  Weekly.

5   Q.  And in what form would he pay you?

6   A.  By check.

7   Q.  Did you ever have to sign a receipt when you received your

8   pay at -- when you were first hired at Hakata?

9   A.  No.

10  Q.  And when you first started at Hakata, would you receive any

11  kind of supplementary pay if you worked more than 40 hours in a

12  week.

13  A.  No.

14  Q.  Did your pay change over the course of your time at Hakata?

15  A.  Yes.

16  Q.  When's the first time it changed?

17  A.  Approximately in March of -- October of 2010, when they

18  began to pay me 5.

19  Q.  Is that $5 per hour or something else?

20  A.  Yes, $5 an hour.

21  Q.  And did your pay ever change after that point?

22  A.  Yes.

23  Q.  How so?

24  A.  Approximately from 2012 to 2014 it changed to 5.65 an hour.

25  Q.  Did your pay ever change after that point?

1    A.  No.

2    Q.  Was there any point after you were first hired that you

3    started having to sign for your pay?

4    A.  No.  Never.

5    Q.  You testified earlier that you were a deliveryman.  Did you

6    ever receive tips?

7    A.  Yes.

8    Q.  And when you first started at Hakata was it ever explained

9    how receiving tips would affect your compensation?

10   A.  No.

11   Q.  Was it in fact ever described to you at any point during

12   your time at Hakata how tips were going to affect your

13   compensation from Hakata?

14   A.  No.

15   Q.  Can you describe in some detail what your job as a delivery

16   worker required.

17   A.  I had to prepare soy sauce.  I had to go to market every

18   day to buy soda.  Upon coming back with the soda, I had to fill

19   the refrigerator.  We had to wash the utensils, clean the

20   kitchen floor, first of all, soaping it up with a brush and

21   soap and after that rinsing it.

22         Two times a week I had to prepare the ginger dressing.

23   In order to do that, I had to cut the onions, peel the ginger.

24   After that I had to liquefy it, and then after that I had to

25   fill a container of approximately 20 liters, I'm not sure.

 1              When deliveries arrived with the containers for the

 2      food, we had to take them out of the box and arrange them for

 3      the cooks.

 4      Q.   Anything else?

 5      A.   We had to take out the garbage.  That's all.

 6      Q.   OK.  So how much time would you estimate -- let's start

 7      from the beginning of your employment.

 8              How much time would you estimate that you spent doing

 9      nondelivery tasks at Hakata when you first started your

10      employment?

11      A.   Two hours.

12      Q.   All right.  And would that change over your time at Hakata?

13      A.   No.

14              THE COURT:  I'm sorry, sir.

15              Two hours per day?  Per week?

16              THE WITNESS:  Two hours a day.

17      BY MR. CLARK:

18      Q.   Let me just go through each of these tasks specifically.

19      You said that you prepared soy sauce.  How often a week would

20      you prepare soy sauce?

21      A.   Yes.

22      Q.   How often a week would you prepare soy sauce?

23      A.   Every day from Monday through Friday.

24      Q.   And how much time would you estimate a day you spent

25      preparing soy sauce?

Gb3nval1                          Cid - direct

1    A.   A half an hour.

2    Q.   You also testified that you would wash utensils.

3              How many hours a day would you estimate that you would

4    wash utensils?

5    A.   Half hour.

6    Q.   You also testified that you would clean the kitchen floor.

7              How often per week would you clean the kitchen floor?

8    A.   Every day.

9    Q.   And how much time would you spend cleaning the kitchen

10   floor when you cleaned the kitchen floor?

11   A.   Half hour.

12   Q.   You also testified that two times a week you would make a

13   ginger sauce.  How much time would you spend making that ginger

14   sauce when you would make ginger sauce?

15   A.   Half hour.

16   Q.   You testified that you would stock soda.  How many times in

17   a week would you have to stock soda?

18   A.   Every week.

19   Q.   How many times in a week?  Is it only just once a week?

20   A.   Once.

21   Q.   And when you had to stock the soda, how long would that

22   take?

23   A.   About 15 minutes.

24   Q.   And you also testified that you would deliver food at the

25   restaurant, correct?

Gb3nval1                        Cid - direct

1    A.  That's correct.

2    Q.  How many deliveries would you estimate that you would make

3    on a typical day when you first started at Hakata?

4    A.  22 orders.

5    Q.  Let me just move to the year 2012.

6            How many deliveries would you make on a typical day

7    working in 2012?

8    A.  In 2010?

9    Q.  '12.  2012.

10           THE INTERPRETER:  In English.

11   A.  About the same, almost 22.

12   Q.  And how many deliveries would you estimate that you would

13   make a day in 2013?

14   A.  22 per day.

15   Q.  And how many deliveries would you estimate that you would

16   make on a typical day in 2014?

17   A.  22.

18   Q.  And how many delivery workers were working at Hakata while

19   you were working in 2012?

20   A.  Four.

21   Q.  Did that change in 2013?

22   A.  No.

23   Q.  Did that change in 2014?

24   A.  Yes.

25   Q.  How did it change?

Gb3nval1                          Cid - direct

1   A.  One delivery guy stopped working.

2   Q.  So, if I understand your testimony correctly, at some point

3   in 2014 there moved from being four to three delivery workers,

4   is that correct?

5   A.  Oh, no.  No.  I'm mistaken.

6   Q.  So how many delivery workers were there in 2014?

7           THE INTERPRETER:  In 2014, counsel?

8           MR. CLARK:  2014.  Yes.  Thank you.

9   A.  Four.

10  Q.  OK.  So if you could explain, what did you mean when you

11  said that a delivery worker left?

12  A.  Well, in 2012, in 2012 and previous years there were four

13  of us deliverymen.

14  Q.  OK.  But I thought --

15          THE INTERPRETER:  Interpreter's correction.

16          Five of us deliverymen.

17          MR. CLARK:  Oh, OK.

18  Q.  So, to ask you again to clarify your testimony, how many

19  delivery men were at the restaurant in 2012?

20  A.  Four.

21  Q.  OK.  Then how many delivery men were at the restaurant in

22  2013?

23  A.  I don't recall exactly, but there were quite a few.

24  Q.  Was it more or less than four?

25  A.  No.  There were more than four.

Gb3nval1                        Cid - direct

1   Q.  Then how many deliverymen were there in 2014?

2           MR. FERST:  Objection.

3           Asked and answered.

4           THE COURT:  If you have an answer, you can translate

5   it.

6   A.  Four.

7           THE COURT:  Let's go on to something else at this

8   point.

9           MR. CLARK:  OK.

10  BY MR. CLARK:

11  Q.  As a delivery worker, did you ever have the opportunity to

12  see the value of the deliveries that you would deliver?

13          MR. FERST:  Objection.  Relevance.

14          THE COURT:  What is the relevance?

15          MR. CLARK:  They are not consenting to enterprise

16  coverage.

17          THE COURT:  The $500,000?

18          MR. CLARK:  Yes.

19          MR. FERST:  Yes.

20          THE COURT:  You'll concede the revenue is more than

21  $500,000 a year?

22          MR. FERST:  We don't concede.

23          THE COURT:  He can answer the question.

24          Should we repeat it perhaps?

25          MR. CLARK:  Yes.

Gb3nval1                          Cid - direct

1              THE WITNESS:  Yes, please.

2     BY MR. CLARK:

3     Q.  As a delivery worker did you have the opportunity to know

4     the value of the deliveries that you would deliver?

5     A.  Yes.

6     Q.  And what would you estimate an average delivery would cost

7     in 2012 that you made?

8     A.  $30.

9     Q.  And what would you estimate the average delivery in 2013

10    would cost?

11    A.  About $20 and more.

12    Q.  But what would you estimate would be the average?

13    A.  About $25.

14    Q.  And in 2014, what would you estimate the average value of

15    each of your deliveries were?

16    A.  Well, that would depend, because by then we were doing

17    catering, and those were big orders.

18    Q.  So what would be your estimate if you could --

19    A.  So the cost was higher.

20              THE COURT:  Hold on.  I don't understand.

21              Catering is something he's involved in and he's

22    delivering orders?  Clear this up.

23              MR. CLARK:  Yes.

24              THE COURT:  I don't know the foundation for his

25    knowledge.

Gb3nval1                              Cid – direct

1   BY MR. CLARK:

2   Q.  Let's clarify this.  You said that in 2014 they started

3   doing catering?

4   A.  Yes.  I'm not very sure if that happened before that, but

5   they did start doing catering.

6   Q.  Did you personally assist in the catering, or is this just

7   something that you know about?

8   A.  No, I helped out doing prep work in the kitchen when there

9   was catering.

10  Q.  Would you actually do deliveries or participate in the

11  catering itself?

12  A.  Yes.  I did the deliveries.  We did the deliveries.

13  Because there were only two delivery guys -- well, the rest of

14  the delivery guys were the ones who would bring the deliveries

15  for catering.

16  Q.  But you yourself wouldn't bring the deliveries for

17  catering?

18  A.  Yes, sometimes.

19  Q.  OK.  What I'm interested in for 2014 is the average value

20  of the deliveries that you would do yourself.

21  A.  About $30.

22  Q.  All right.  Thank you.

23          Do you know an individual named Mr. Allan Wartski?

24  A.  Yes.

25  Q.  Who is Allan Wartski?

Gb3nval1                        Cid - direct

1    A.  He's the owner of Hakata Restaurant.

2    Q.  And in your estimation how often does he come to the

3    restaurant?

4    A.  Once a month.

5    Q.  And what does he do at the restaurant?

6    A.  Well, he would come over there and talk to the manager.

7    That was Pedro Garzon.

8    Q.  And what was your understanding of the relationship between

9    the manager and Mr. Wartski?

10            MR. FERST:  Objection.

11            THE COURT:  You are asking this why?

12            MR. CLARK:  I don't believe that we stipulated that

13   Mr. Wartski is an individual defendant in this case or an FLSA

14   employer in the case.

15            THE COURT:  Hold on.

16            Is he a defendant or not?

17            MR. CLARK:  He is a defendant, yes.

18            THE COURT:  You want to show he is an employer for

19   FLSA purposes?

20            MR. CLARK:  Yes.

21            THE COURT:  Is that contested?

22            MR. FERST:  No.

23            MR. CLARK:  In which case we don't need to go do it.

24            THE COURT:  Is there a New York Labor Law claim?

25            MR. FERST:  Yes.

Gb3nval1                          Cid - direct

1          MR. CLARK:  Yes your Honor.

2          THE COURT:  What about for New York Labor Law

3   purposes?

4          MR. CLARK:  For New York Labor Law purposes I don't

5   think it's going to be an issue to my understanding.  It would

6   make things easier if it was conceded that he was an employer

7   for purposes of the FLSA and the New York Labor Law.

8          THE COURT:  I am not taking a position.  I just wanted

9   to understand --

10          MR. CLARK:  No, I didn't --

11          THE COURT:  -- what this agreement was.

12          Right now it's just FLSA.

13          MR. CLARK:  Is it also for the New York Labor Law?

14          MR. FERST:  Why don't you develop that.

15          MR. CLARK:  OK.

16   BY MR. CLARK:

17   Q.  And how long have you known Mr. Wartski?

18   A.  For approximately seven years.

19   Q.  Is that seven years from today or seven years from when you

20   were employed or something else?

21   A.  No.  That was during the time I was working there.

22   Q.  So can you give me a year when you first met Mr. Wartski?

23   A.  2008.

24   Q.  Do you recall how you first met Mr. Wartski?

25   A.  Yes.  Because he would come to the restaurant and we all

1    would see him and people said he was the owner.

2    Q.  OK.  Did you have any other interactions with Mr. Wartski?

3    A.  No.

4    Q.  Do you know where Mr. Wartski was located when he wasn't at

5    the restaurant?

6    A.  Yes.

7    Q.  Where was that?

8    A.  He had an office at 247 West 47th Street.

9    Q.  Did you ever go there?

10   A.  I would go to pick up the employee payments every week and

11   I would deliver them to the manager, Pedro Garzon.

12   Q.  And who would you pick up the employment payments from?

13   A.  What do you mean?  You mean who gave them to me?

14   Q.  Yes.

15   A.  Well, they have an accountant.

16   Q.  OK.  Did you ever have to interact with Mr. Wartski when

17   you would do this?

18   A.  No.  I would just see him at a distance sometimes, and we

19   would say hi to each other.  That was it.

20          MR. CLARK:  I don't think I have any more questions

21   for this particular witness, your Honor.

22          THE COURT:  Mr. Ferst?

23          MR. FERST:  Thank you, your Honor.

24   CROSS EXAMINATION

25   BY MR. FERST:

Gb3nval1                         Cid - cross

1    Q.  Mr. Cid, you say that you are known as Edgar Cid?

2    A.  Yes.  But when I worked there I had a different name.  I

3    was known by a different name.

4    Q.  Why?

5    A.  That's how I put myself down.

6    Q.  OK.

7    A.  Well, it's because someone lent me a Social Security number

8    to work under that name.

9    Q.  I see.  Now, you have told us about a change in your hours

10   at different times in your employment at Hakata, is that

11   correct?

12   A.  Yes.

13   Q.  And you've always referred to Hakata as the restaurant, is

14   that correct?

15   A.  Well, it used to have a different name previously.  It had

16   a different name.  It was Gordon Chen's Kitchen, and there

17   were, the two kitchens were right there.

18   Q.  When you started working -- which I believe you said was in

19   September of 2008, is that correct?

20   A.  Yes.

21   Q.  Where was the restaurant located?

22   A.  231 East 53rd.

23   Q.  From the very beginning?

24   A.  Yes.

25   Q.  So it never changed location?

Gb3nval1                    Cid - cross

1    A.  Well, they owned two restaurants.  He had another

2    restaurant that was on 48th Street.  It was in between Broadway

3    and Seventh Avenue.  I don't really remember the address, but

4    it was on 48th.

5    Q.  And did you work there?

6    A.  Sometimes they would make changes and then the people from,

7    who did delivery from over here on 53rd Street would be sent

8    over there.

9    Q.  And when was this?

10   A.  Approximately 2009; 2009 to 2010.

11   Q.  So is it your testimony that in the period 2009, 2010, you

12   would work on the East 53rd Street location, and at the same

13   time on different occasions work on the West Side on 48th

14   Street?

15   A.  Yes.  I would have to go there twice a week.

16   Q.  You testified that you received tips.  Do you recall that?

17   A.  Yes.

18   Q.  And you've testified that you were paid by check, is that

19   correct?

20   A.  Yes.

21   Q.  Can you describe how you got the checks?

22   A.  What do you mean?  How I received them.

23   Q.  Who gave them to you?

24   A.  Oh, Pedro Garzon.

25   Q.  And how often did Pedro Garzon give you your paycheck?

Gb3nval1                         Cid - cross

1    A.   Weekly.

2    Q.   What did it look like?  What did the check look like?

3    A.   Like a check.

4    Q.   Did it have anything attached to it?

5    A.   Yes.

6    Q.   What did it have attached to it?

7    A.   I never paid any attention to it.

8    Q.   Well, try to search your memory.  You have told us that

9    there was something attached to the check, correct?

10   A.   Yes.

11   Q.   What was attached?  How big was the attachment to the

12   check?

13   A.   Well, the check was a letter sized piece of paper.

14   Q.   The check itself or the entire document that you received?

15   A.   The entire document.

16   Q.   And is it fair to say that you could detach the check from

17   the inside of the document?

18   A.   Yes.

19   Q.   So once you took the check off the document, try to

20   remember what was left?  What was on the rest of the document

21   that wasn't the check?

22   A.   Well, the check payment.

23   Q.   Well, what was written on the piece of paper?

24   A.   Well, honestly, I never paid very much attention to that.

25   Q.   Well, was it a blank piece of paper or was there writing on

1    it?

2    A.   There was writing on it.

3    Q.   Could that writing have been the number of hours you

4    worked?

5              MR. CLARK:   Objection.

6              THE COURT:   Overruled.

7    A.   Yes.

8    Q.   And could it have had the hourly rate that you were paid?

9    A.   Yes.

10   Q.   And could it have had a notation of how much you got in

11   tips that week?

12   A.   Yes.

13   Q.   And could it have specified how much was withheld from your

14   wages?

15   A.   That I wouldn't know, but the tips that we -- out of the

16   tips that we were paid, they took 15 percent from us.

17   Q.   You said you were paid weekly, is that correct?

18   A.   Yes.

19   Q.   Is it fair to say that every week you received a document

20   of the kind you have just described?

21   A.   Yes.

22   Q.   And that document on a weekly basis had the check which

23   could be detached, is that correct?

24   A.   Yes.

25   Q.   And the rest of the document after you tore away the check

1   had writing on it, correct?

2   A.   Correct.

3   Q.   Is it fair to say that every check specified that you

4   worked 40 hours that week?

5   A.   Yes, but I did not work 40 hours.

6   Q.   I believe you have testified that you worked 50 hours a

7   week, is that correct?

8   A.   Yes.

9   Q.   And did you bring to anyone's attention this discrepancy?

10  A.   What do you mean?  What discrepancy?  What are you

11  referring to?  I don't understand the question.

12  Q.   You have said that the piece of paper said that you worked

13  40 hours during the week, is that correct?

14  A.   Yes.

15  Q.   But you have testified that you actually worked 50 hours

16  every week, is that correct?

17  A.   Yes.

18  Q.   So would you agree with me that there is a discrepancy

19  between 40 hours a week and 50 hours a week?

20  A.   What do you mean discrepancy?  What are you referring to?

21          THE COURT:  Could you try using a different word

22  maybe.

23  Q.   Is 40 hours a week different than 50 hours a week?

24  A.   Of course.  Of course they're different.

25  Q.   If you were working 50 hours a week, you would have been

1  entitled to more money at the hourly rate, isn't that so?

2  A.  Yes.

3  Q.  You are telling us that you didn't get that extra money,

4  isn't that what you are saying?

5  A.  I did receive it, but we would get that money in a

6  different check written, payable to a different person, and

7  then that person would cash the check and pay us in cash, but

8  at the regular hours.

9  Q.  Who was that other person?

10 A.  The check came out in the name of Alejandro.

11 Q.  Alejandro who?

12 A.  I don't recall the last name.

13 Q.  Is it fair to say that you are named in this lawsuit as

14 Edgar Cid, also known as Daniel Lopez?

15 A.  Yes.

16 Q.  Was the other check payable to Daniel Lopez?

17 A.  No.

18 Q.  How do you know that there was another check?

19 A.  Because that check would be given to another person, named

20 Miguel Arellano, and you could say that he was kind of in

21 charge of us delivery guys.  He was the one who would cash them

22 and pay us, but the check would be in a different person's

23 name.

24 Q.  So you are saying that you worked 50 hours a week and you

25 were paid 50 hours a week?

Gb3nval1                         Cid - cross

1   A.  Well, you could say that we got the 40 by check and the

2   rest of the time we worked was the check that was payable to

3   this other person who did not appear at the restaurant.  You

4   could call it a phantom check.

5   Q.  But you are saying you got that money in cash, is that what

6   you are telling us?

7   A.  Yes.  Through that person Miguel Arellano.

8   Q.  But you got the money?

9   A.  Yes, at a regular hourly rate.

10  Q.  During your employment at Hakata, were you ever employed

11  elsewhere?

12  A.  No.

13  Q.  You have described various things you did at what you call

14  the restaurant, is that correct?

15  A.  Yes.

16  Q.  You've stated that the restaurant, at least one of them was

17  on East 53rd Street, is that correct?

18  A.  Correct.

19  Q.  Please describe it to us.

20  A.  Well, at the 53rd Street restaurant it had -- there were

21  two kitchens there.  There was Hakata and Gordon Chen's

22  Kitchen.

23  Q.  On East 53rd Street is it on the street level?

24  A.  No.  It's in the basement.

25  Q.  And does it have tables?

Gb3nval1                          Cid - cross

1   A.  No.

2   Q.  Does it have chairs?

3   A.  The only ones that had were the ones that we employees

4   would sit on to eat.

5   Q.  Was that in the public area?

6   A.  Well, they were in the restaurant.

7   Q.  When a customer came in, was there a counter?

8   A.  Yes.

9   Q.  And did they come to pick up food at the counter?

10  A.  Yes.

11  Q.  Aside from picking up food, did any customers eat in the

12  restaurant?

13  A.  No.

14          MR. FERST:  I have no further questions.

15          Thank you.

16          MR. CLARK:  No redirect, your Honor.

17          THE COURT:  OK.

18          You can step down, Mr. Cid.

19          (Witness left the stand)

20          THE WITNESS:  Thank you.

21          THE COURT:  I am prepared to go to the next witness

22  unless someone wants to take a break.

23          MR. CLARK:  The plaintiffs call Mr. Valle to the

24  stand.

25   ALEJANDRO VALLE HERRERA,

Gb3nval1                        Valle - direct

1          a Plaintiff herein,

2          having been duly sworn, testified as follows:

3               (Through interpreter)

4               THE COURT:  You can proceed when you're ready,

5     Mr. Clark.

6               MR. CLARK:  Thank you, your Honor.

7     DIRECT EXAMINATION

8     BY MR. CLARK:

9     Q.  Good morning, Mr. Valle.

10          How old are you?

11    A.  47 years old.

12    Q.  And what is the highest education you have received?

13    A.  High school.

14    Q.  And what is your first language?

15    A.  Spanish.

16    Q.  And can you read in Spanish?

17    A.  Yes.

18    Q.  Can you write in Spanish?

19    A.  Yes.

20    Q.  Do you speak English?

21    A.  Very little.

22    Q.  Can you read in English?

23    A.  No.

24    Q.  And can you write in English?

25    A.  No.

1    Q.  And have you ever worked for a restaurant called Hakata?

2    A.  Yes.

3    Q.  And what is Hakata?

4    A.  Hakata is a Japanese restaurant.

5    Q.  And where is Hakata located?

6    A.  At 232 East 53rd Street.

7    Q.  When did you start working at Hakata?

8    A.  In October of 2010.

9    Q.  And when did you stop working at Hakata?

10   A.  In 2014.

11   Q.  And when in 2014?

12   A.  In November.

13   Q.  And how did you first find your job at Hakata?

14   A.  At that time Johnny called Pedro.  And I knew him and I

15   asked him if there was work.

16   Q.  And you say Johnny called Pedro, who is Johnny?

17           THE INTERPRETER:  The interpreter would have to

18   inquire further.  Apparently I made a mistake.

19           THE COURT:  OK.

20   A.  I found the job through Pedro.

21   Q.  And who's Pedro?

22   A.  Now he's -- well, he's the manager.

23   Q.  Did you interview with anyone about the job?

24   A.  No.  It was directly with him.

25   Q.  Can you describe how you worked out the specifics of the

1   job with Pedro?

2           THE INTERPRETER:  Interpreter requires clarification.

3   A.  I was not informed.

4   Q.  OK.  Were you told what kind of job that you would be

5   having at Hakata?

6   A.  Delivery boy.

7   Q.  And was what a delivery worker does at Hakata described to

8   you at that time?

9   A.  No.

10  Q.  And were you told a schedule at that time?

11  A.  Yes.

12  Q.  And what was your schedule supposed to be when you were

13  first hired at Hakata?

14  A.  From 10:30 to 2 and from 4 to 10:30.

15  Q.  When you actually started working at Hakata, was that the

16  schedule that you worked?

17  A.  Yes.

18  Q.  And when you first started working at Hakata, did you have

19  to record when you came in exactly in the morning?

20  A.  No.

21          THE COURT:  If we could, Mr. Clark --

22          MR. CLARK:  Yes.

23          THE COURT:  -- since you asked, you referred to a

24  schedule that he worked, and I don't know how many days that

25  was.

 1              MR. CLARK:  My apologies, your Honor.

 2     A.  Five days.  Monday through Friday.

 3     Q.  When you first started working, did you have to record

 4     exactly when you would leave at the end of the day?

 5     A.  No.

 6     Q.  All right.  At some point did the schedule that you just

 7     described change?

 8     A.  Yes.

 9     Q.  How so?

10     A.  Around 2012.

11     Q.  And what changed in 2012?

12     A.  I had to get to work earlier.

13     Q.  How so?

14     A.  It became from 9:30 to 2 and from 4 to 10:30.

15     Q.  Was there any change to the number of days that you would

16     work?

17     A.  No.

18     Q.  And did your schedule change any time after that?

19     A.  No.

20     Q.  Before any of these changes or at any other time during

21     your employment, did you ever start having to record when you

22     would come in in the morning?

23     A.  No.

24     Q.  Did you ever start having to record exactly when you would

25     leave at the end of the day?

Gb3nval1                    Valle - direct

1    A.  In the end, yes.

2    Q.  What do you mean by "in the end"?

3    A.  Yes.  That changed when the manager gave us that number to

4    punch into the computer, but that was just for a period of

5    time.

6    Q.  First of all, what time did this start?

7    A.  Around 2012.

8    Q.  And what would you have to do starting in this period in

9    2012?

10   A.  With regard to my work?

11   Q.  With regard to your putting a number in a system.

12   A.  Could you repeat the question again.

13   Q.  You testified that at some point you needed to start

14   putting a number into a system when you would come in in the

15   morning.  Isn't that right?

16   A.  Yes.

17   Q.  And how long did you have to do that?

18   A.  The most for two months.

19   Q.  Other than this two-month period in 2012, did you ever have

20   to record when you would come in in the morning?

21   A.  No.

22   Q.  When you were first hired, were you told what you were

23   going to be paid?

24   A.  No -- oh, yes.  Excuse me.  Yes.

25   Q.  And what were you told you were going to be paid?

1    A.   They told me they were going to pay me 4.65 per hour.

2    Q.   Was that actually how much you were paid when you first

3    started?

4    A.   That's what they gave me.

5    Q.   Who would pay you each week when you first started?

6    A.   The manager.

7    Q.   Who's that?

8    A.   Pedro Garzon.

9    Q.   How did he pay you?

10   A.   Check.

11   Q.   Anything else?

12   A.   No.

13   Q.   Did you have to sign a receipt showing that you had

14   received your pay each week?

15   A.   No.

16   Q.   At any point in your employment, did you ever have to sign

17   anything to receive your pay?

18   A.   No, never.

19   Q.   Did your pay ever change from 4.65 an hour?

20   A.   Yes.

21   Q.   When was that, the first change?

22   A.   In January of 2011 we were paid 5.

23   Q.   Is that $5?  Is that five in dollars?

24   A.   Yes.

25   Q.   Is that per hour?

1    A.   Yes.

2    Q.   Did your pay ever change after that point?

3    A.   Yes.

4    Q.   When was that?

5    A.   That was in October of 2012.  Then it was 5.65.

6    Q.   Again, is that per hour?

7    A.   Yes.

8    Q.   Did your pay ever change after that point?

9    A.   No.

10   Q.   And did you receive tips while working as a deliveryman at

11   Hakata?

12   A.   Yes.

13   Q.   When you first started at Hakata, was it ever described how

14   receiving tips was going to affect how much money you received

15   from Hakata?

16   A.   No.

17   Q.   At any point did anyone describe how you receiving tips was

18   going to affect your wages at Hakata?

19   A.   No.

20   Q.   Now, you mentioned that you had been hired as a delivery

21   worker at Hakata.  Can you describe the sort of tasks you would

22   do as a delivery worker at the restaurant.

23   A.   They paid us by the order delivered to the customer.

24   Q.   Did you ever have to do anything else other than --

25             THE COURT:  Wait.

1            They paid you by the order?  Is that what you said?

2            THE WITNESS:  No.

3            THE INTERPRETER:  Interpreter corrects himself for the

4    record.

5            THE WITNESS:  We prepared the deliveries for the

6    customers.

7    BY MR. CLARK:

8    Q.  Would you actually deliver the deliveries to the customer?

9    A.  Yes.

10   Q.  Did you do anything else other than deliver food at your

11   time at Hakata?

12   A.  Yes, a lot of things.

13   Q.  And what things?

14   A.  In the morning when I arrived I prepared the fruit salad, I

15   did salads.  I cleaned the floors during the day.  We also

16   washed dishes.  We also prepared the bags for the delivery.  We

17   also prepared the forks and the chopsticks, because they were

18   different.  When the deliveries arrived we had to take them

19   down and place them on the shelves.

20   Q.  Anything else?

21   A.  When there were few people there in 2013, when my coworker

22   left, I had to take over his responsibilities.

23   Q.  And what were those?

24   A.  Well, in the beginning I bought sodas.  I would I put them

25   in the refrigerator.  I did the ginger dressing.  I prepared

1  the soy sauce.  That's it.

2  Q.  Well, how much time would you estimate that you spent doing

3  nondelivery tasks on a typical day at Hakata?

4  A.  Between three to four hours maximum.

5  Q.  I am going to ask you more specifically about some of the

6  things that you described doing at Hakata.

7  A.  OK.

8  Q.  You said that you prepared salad at Hakata.

9  A.  Yes.

10  Q.  How many times would you do that per week?

11  A.  Every day.

12  Q.  How much time would you estimate that you spent preparing

13  the salad?

14  A.  Maximum around 30 to 40 minutes.

15  Q.  You testified that you would clean the floor.

16       How many times per week would you clean the floor?

17  A.  From Monday through Friday twice.

18  Q.  And how much time would you spend cleaning the floor on

19  days that you would clean the floor?

20  A.  About 45 minutes.

21  Q.  And how many days per week would you typically wash dishes?

22  A.  Two times.

23  Q.  And how much time would you spend washing dishes when you

24  did wash dishes?

25  A.  More than 30 minutes.

Gb3nval1                          Valle - direct

1  Q.  You also testified that you prepare forks and chopsticks.

2        How often would you do that in a typical week?

3  A.  About 20 minutes.

4  Q.  You also testified that you would take down deliveries.

5  How often -- first, to clarify, when you say take down

6  deliveries, what do you mean?

7  A.  Sometimes we had to take them down from the street.  Since

8  the restaurant is in the basement, we had to take them

9  downstairs.

10 Q.  What do you mean by deliveries in this context?

11 A.  Could you repeat the question.

12 Q.  What do you mean by deliveries in this context?

13 A.  Taking the food to the customer.

14 Q.  Well, you said that you would take it down to the basement.

15 A.  When the deliveries from the companies that they had

16 ordered arrived.

17 Q.  So, if I understand correctly, you meant deliveries from

18 suppliers, right?

19 A.  Yes.

20 Q.  How often would you have to handle these kinds of

21 deliveries in a typical week?

22 A.  Sometimes two times per week.

23 Q.  And how much time would these deliveries take when you had

24 to do them?

25 A.  Not a lot of time.  About 20 minutes maximum.

1    Q.  You testified that in 2014 you started having some

2    additional duties.

3    A.  Yes.

4    Q.  How often in a week would you have to buy soda?

5    A.  That would be at the beginning of the week, on Mondays and

6    on Wednesdays.

7    Q.  How often would this task take when you did it -- or how

8    much time would this take.  My apologies.

9    A.  About a half an hour.

10   Q.  And how often in a week would you have to make ginger

11   dressing after this point?

12   A.  Two times.

13   Q.  How long would it take to make the ginger dressing on days

14   that you made ginger dressing?

15   A.  30 minutes.

16   Q.  How often in a week would you have to make soy sauce?

17   A.  That was done every day.

18   Q.  And how much time would you have to spend making soy sauce

19   on days that you made soy sauce?

20   A.  Between 20 and 25 minutes.

21   Q.  You also testified that you made deliveries during your

22   time as a deliveryman, correct?

23   A.  Yes.

24   Q.  How many deliveries would you estimate that you would make

25   on a typical day in 2012?

Gb3nval1                        Valle – direct

1    A.  About 25.

2    Q.  How many deliveries would you estimate you would make on a

3    typical day in 2013?

4    A.  About 22.

5    Q.  And how many deliveries would you estimate you would make

6    in a typical day in 2014?

7    A.  About 18.

8    Q.  And how many deliverymen were working at the restaurant in

9    2012, including yourself?

10   A.  Four.

11   Q.  How many deliverymen were working at the restaurant in

12   2013?

13   A.  Four.

14   Q.  And how many deliverymen were working at the restaurant in

15   2014?

16   A.  Three.

17   Q.  Now, during your time as a deliveryman at Hakata, did you

18   ever have the opportunity to see the value of the deliveries

19   that you were delivering?

20   A.  No.

21   Q.  Well, when you would deliver items to customers, you would

22   have to sometimes accept payment for those, right?

23   A.  Yes.

24   Q.  Would you need to know the value of what you were

25   delivering in order to accept payment?

Gb3nval1                    Valle - direct

1    A.  Yes.

2    Q.  From that you would know how much some of your deliveries

3    cost, right?

4            MR. FERST:  Objection.

5    A.  Yes.

6            THE COURT:  Overruled.  I'm going to let him ask it.

7    Q.  Can you tell us, if you know, what the average value of a

8    typical delivery in 2012 would be?

9    A.  Between 25 and 30 dollars.

10   Q.  Would you be able to estimate, if you know, what the

11   average value of a delivery you would make in 2013 would be?

12   A.  It would be very little, say $18.

13   Q.  If you know, what would you estimate the value of a

14   delivery would be in 2014?

15   A.  In what year was that?  Excuse me.

16   Q.  2014.

17   A.  At that point it changed because at then we were doing

18   catering.

19   Q.  But would you personally participate in the catering?

20   A.  Yes.

21   Q.  Well, just judging from your own personal experience, could

22   you estimate what the value of a delivery in 2014 would be?

23   A.  Sometimes somewhere between $6,000 and $7,000.

24   Q.  Well, to clarify, I'm not asking for the average value of a

25   catering delivery, but just any particular --

Gb3nval1                          Valle – cross

1           THE COURT:  Hold on.

2           MR. CLARK:  Yes.

3           THE COURT:  Sir, did you do deliveries to customers in

4    2014?

5           THE WITNESS:  Yes.

6           THE COURT:  About how many per day?

7           THE WITNESS:  Approximately, in 2014, about 18.

8           THE COURT:  That does not include catering, is that

9    correct?

10          THE WITNESS:  Yes.

11          THE COURT:  Can you estimate the average cost to the

12   customer of each of those deliveries?

13          THE WITNESS:  Around $30.

14          MR. CLARK:  No further questions of this witness, your

15   Honor.

16   CROSS EXAMINATION

17   BY MR. FERST:

18   Q.  Sir, you said you were paid by check, is that correct?

19   A.  Yes.

20   Q.  And was that on a weekly basis?

21   A.  Yes.

22   Q.  You have described to us some work that you did that was

23   not delivery, is that correct?

24   A.  Yes.

25   Q.  Were you paid for that work?

Gb3nval1                         Valle – cross

1    A.  They paid me the 40 hours supposedly by check, but as far

2    as the overtime goes, they paid me in a separate check, but

3    they only paid me regular time.

4    Q.  Were you paid by the same check for the delivery work and

5    for the nondelivery work?

6    A.  No.

7    Q.  Were you paid by separate checks?

8    A.  Just the regular hours by check.

9    Q.  What do you mean just the regular hours?

10   A.  The 40 hours.

11   Q.  My question, sir, is were you paid by the same check for

12   the delivery work that you did on a weekly basis and the

13   nondelivery work you did on a weekly basis?

14   A.  No.

15           THE COURT:  Mr. Ferst, can I take a crack at this

16   please?

17           MR. FERST:  Yes, of course.

18           THE COURT:  Sir, you got a check once a week, is that

19   correct?

20           THE WITNESS:  Yes.

21           THE COURT:  That check was for how many hours?

22           Do you know?

23           THE WITNESS:  40 hours.

24           THE COURT:  Did you receive additional money over and

25   above that check?

Gb3nval1                          Valle - cross

1              THE WITNESS:  Yes.  The check that was changed for me

2       by this other person, my coworker.

3              THE COURT:  And together these two checks covered all

4       your hours?

5              THE WITNESS:  Supposedly.

6              THE COURT:  Why do you say "supposedly"?

7              THE WITNESS:  Because what they were paying us

8       never -- well, as far as I know, they never paid us overtime.

9              THE COURT:  I'm not asking you about the rate of

10      payment.  I am just asking about the total number of hours.

11             Did these two checks cover the total number of hours

12      that you worked?

13             THE WITNESS:  Yes.

14             THE COURT:  And those total hours, did they include

15      both work doing delivery and work doing nondelivery tasks?

16             THE WITNESS:  Yes.

17             THE COURT:  Go ahead, Mr. Ferst.

18             MR. FERST:  Thank you, your Honor.

19      BY MR. FERST:

20      Q.  How did you get paid?

21      A.  By check.

22      Q.  Who gave you the check?

23      A.  Pedro Garzon.

24      Q.  Can you describe the check for us.

25      A.  I honestly don't really remember.

Gb3nval1                    Valle - cross

1   Q.  Well, was it just a check or was there something attached

2   to the check?

3   A.  Well, all I would say really is that it would say Gordon

4   Chen on it, it would have Gordon Chen's name on it.

5   Q.  How big was the check?

6   A.  Well, it was just like a regular check.  It was about this

7   size.  It wasn't a personal check.  It was a little bit bigger.

8   Q.  Was there anything attached to the check?

9   A.  No.  I honestly don't remember.

10  Q.  Try to remember.  Did you have to separate the check from

11  another piece of paper?

12  A.  No.  I honestly don't remember.

13          MR. FERST:  I have no further questions.

14          Thank you.

15          MR. CLARK:  No redirect, your Honor.

16          THE COURT:  Just one question.

17          The other delivery people that were working with you,

18  you said there were a total of three or four, is that correct?

19          THE WITNESS:  Yes.

20          THE COURT:  Do you know how many deliveries they were

21  doing?

22          THE WITNESS:  Well, sometimes they would do more.

23          THE COURT:  My question is do you know how many they

24  did approximately?

25          THE WITNESS:  About 30.

Gb3nval1                        Valle - cross

1              THE COURT:  Anything further, Mr. Clark?

2              MR. CLARK:  Nothing.  Well, just before plaintiff's

3      rest I --

4              THE COURT:  No.  While he's on the stand.

5              MR. CLARK:  No.

6              THE COURT:  Anything further, Mr. Ferst?

7              MR. FERST:  No.  Thank you, your Honor.

8              THE COURT:  OK.  You can step down, Mr. Valle.

9              (Witness left the stand)

10             THE COURT:  Go ahead.

11             MR. CLARK:  Before plaintiffs rest, I did want to

12     address one issue with defense counsel concerning a potential

13     stipulation of admission of defendants' exhibits.

14             THE COURT:  Go ahead.

15             MR. CLARK:  Thank you.

16             (Counsel conferred)

17             MR. CLARK:  Thank you, your Honor.

18             Before plaintiffs rest, we would like to seek

19     admission of defendants' exhibits in this matter.  In the joint

20     pretrial order there was identified a Plaintiff's Exhibit 1,

21     the contents of which I think are reflected essentially in

22     defendants' exhibits.

23             THE COURT:  All I have are Exhibits A through H of

24     defendants.

25             Is there an application with respect to these?

Gb3nval1                    Valle - cross

1              MR. CLARK:  Yes, your Honor.  The parties have

2       stipulated to admit the exhibits A through H into evidence.

3              THE COURT:  Any objection?

4              MR. FERST:  No.  We've stipulated, your Honor.

5              THE COURT:  Exhibits A, B, C, D, E, F, G and H as

6       previously identified by defendants are admitted.

7              (Defendant's Exhibits A, B, C, D, E, F, G and H

8       received in evidence)

9              MR. FERST:  Thank you, your Honor.

10             MR. CLARK:  Thank you, your Honor.

11             No other issues from the plaintiffs.

12             THE COURT:  Mr. Clark, you're resting?

13             MR. CLARK:  Yes, your Honor.

14             THE COURT:  Do you want to break, Mr. Ferst?  Do you

15      want to keep going?  What do you want to do.

16             MR. FERST:  I would first, if the Court would

17      entertain it, like to move to dismiss the complaint for failure

18      to make out a prima facie case.

19             THE COURT:  Are you dismissing the complaint, or are

20      you asking for judgment as a matter of law?

21             MR. FERST:  I'm asking for a judgment as a matter of

22      law.

23             THE COURT:  OK.

24             You can make the application.

25             MR. FERST:  Plaintiff has presented two witnesses.

1   Both witnesses have testified that they were paid for all of

2   the time they worked.  Both of the witnesses have utterly

3   failed to specify what it is that they contend that they were

4   not paid.  Both of the witnesses have buttressed the

5   defendants' defense that at all times they were fully and

6   properly paid.

7           That is the sum and substance of the motion, your

8   Honor.  It is incumbent upon the plaintiff to prove its case.

9   Plaintiffs' testimony has effectively stated that there was

10  payment, and they haven't specified that there was any

11  underpayment.  They have stated it conclusorily but they

12  haven't specified.  They had a full and ample opportunity.

13          The plaintiff has rested.

14          MR. CLARK:  Your Honor, this is an action for minimum

15  wage and overtime.  The plaintiffs have testified concerning

16  their hours.  They've testified concerning their pay.  Their

17  pay was a rate below the minimum wage at all times.

18          They testified that they did not receive proper

19  notice.  There is testimony on the record finding that they did

20  not -- that they worked an improper proportion of untipped

21  work.

22          Accordingly, there's a number of reasons in the

23  factual record that the Court could straightaway find for

24  minimum violations, because they were paid below the minimum

25  wage at a tip credit rate which there is no substance in the

Gb3nval1                          Valle - cross

1    record to support, that there was no payment of overtime, that

2    there was no payment of spread-of-hours pay, that there were no

3    notices under Section 195, either 1 or 3 of the New York Labor

4    Law.  I think those are all fairly straightforward from the

5    testimony that you have heard in this case.

6              THE COURT:  Go ahead.

7              MR. FERST:  I beg to differ with plaintiff's counsel.

8    There was a conclusory statement that overtime wasn't paid, but

9    there was no specification.

10             THE COURT:  They said we only got 4.65 or whatever the

11   rate was for all --

12             MR. FERST:  The testimony --

13             THE COURT:  Let me just finish.

14             MR. FERST:  I apologize.

15             THE COURT:  -- for all the hours instead of what they

16   claim they were working, which I think was 50 hours.

17             MR. FERST:  But they didn't say that.  They said that

18   their pay was advanced from time to time.  Of course, that

19   advance would have been in compliance with minimum wage

20   standards.

21             THE COURT:  An advance?  I didn't hear anything about

22   an advance.

23             MR. FERST:  Yes.

24             The witnesses testified that from time to time their

25   hourly rate was increased.

 1              THE COURT:  I'm sorry.

 2              I didn't understand what you meant by "advance."

 3              MR. FERST:  I'm sorry.

 4              So it's incumbent upon the plaintiff --

 5              THE COURT:  They said that they didn't get time and a

 6    half for time over 40 hours.  Both of them said that.

 7              MR. FERST:  Fair enough.

 8              THE COURT:  OK.  What do you want to do now,

 9    Mr. Ferst?  I'm reserving decision in any event.

10              What do you want to do now, Mr. Ferst?

11              MR. FERST:  I would welcome a brief break.  Then I

12    would like to put defendants' case on.

13              THE COURT:  OK.  My plan is to break, no matter what,

14    by 1.  I'm happy to break at 1, and I'm happy to break now for

15    an hour and come back at 1.

16              Would you rather go to 1?

17              MR. FERST:  I would be pleased to come back at 1,

18    because I'm quite confident that if we do we can finish today.

19              THE COURT:  Why don't we take our break now.

20              Come back here at let's say 1:15.

21              MR. FERST:  Thank you.

22              THE COURT:  OK.  See you all then.  We will open the

23    courtroom a few minutes beforehand.  We normally lock the

24    courtroom unless someone wants to volunteer to stay here and

25    watch it.  Are you all planning to leave?  What are you

Gb3nval1                    Valle - cross

1  planning to do?

2          MR. CLARK:  I think we're all going to leave and go to

3  the cafeteria.  I am happy with the courtroom being locked.

4          MR. FERST:  We will just take the papers.

5          Thank you so much.

6          THE COURT:  We'll lock up behind you.

7          (Luncheon recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Gb3nval1                              Valle - cross

1

2                            AFTERNOON SESSION

3                              (1:15 p.m.)

4            MR. FERST:  A bit of housekeeping, your Honor.

5            The proposed exhibit list had a typo in it on the

6    second page.

7            THE COURT:  You are looking at the joint pretrial

8    order?

9            MR. FERST:  I am looking at the actual book itself,

10   your Honor.

11           THE COURT:  The book.  OK.

12           MR. FERST:  If your Honor will look at second page of

13   the exhibit list.

14           THE COURT:  Yes.

15           MR. FERST:  Exhibit H.

16           The typo is that it pertains to the year 2014, not

17   2012, and counsel was already corrected it when I brought it to

18   his attention.

19           THE COURT:  Thank you.

20           Mr. Ferst, whenever you're ready.

21           MR. FERST:  The defendants call Pedro Garzon.

22    PEDRO GARZON,

23        called as a witness by the Defendants,

24        having been duly sworn, testified as follows:

25   DIRECT EXAMINATION

Gb3nval2                        Garzon - direct

1   BY MR. FERST:

2            MR. FERST:  Your Honor, may I be permitted to question

3   from counsel table, because I have --

4            THE COURT:  Wherever you wish.

5            MR. FERST:  Thank you.

6   BY MR. FERST:

7   Q.  Mr. Garzon, do you know Hakata?

8   A.  Yes.

9   Q.  Do you know Gordon Chen's Kitchen LLC.

10  A.  Yes.

11  Q.  And do you know Mac-War Res Corp.?

12  A.  Yes.

13  Q.  Tell us how you know those names and those companies.

14  A.  Well, I started working for Mac-War Restaurant 22 years

15  ago, and then the company was closed in 2008 and then it was

16  moved to Gordon Chen's Kitchen.

17  Q.  Did both of these companies do business as Hakata Grill?

18  A.  Mac-War Restaurant used to and now Gordon Chen's Kitchen is

19  doing it.

20  Q.  Did there come a time when Mac-War closed?

21  A.  I'm sorry.  I didn't hear your question.

22  Q.  Where was Mac-War located?

23  A.  230 West 48th Street.

24  Q.  Where is Gordon Chen's Kitchen located?

25  A.  231 East 53rd street.

Gb3nval2                          Garzon - direct

1    Q.  Did there come a time when Mac-War ceased operating?

2    A.  Mac-War, December 14, 2008.

3    Q.  In what capacity did you start your employment?

4    A.  As a dishwasher.

5    Q.  What are you now?

6    A.  Now I'm the manager at Gordon Chen's Kitchen.

7    Q.  For how long have you been the manager?

8              THE COURT:  Off the record.

9              (Discussion off the record)

10             THE COURT:  Do you know where you were?

11             MR. FERST:  Yes.

12             THE COURT:  Start over.

13   BY MR. FERST:

14   Q.  You say that you were the manager, sir?

15   A.  Yes.

16   Q.  And when did you become the manager?

17   A.  January 2004.

18   Q.  So that would have been at Mac-War?

19   A.  Yes.

20   Q.  Did there come a time when both locations were open at the

21   same time?

22   A.  I would say a couple of months in 2008.

23   Q.  And after that?

24   A.  Just Gordon Chen's Kitchen at 231 East 53rd Street.

25   Q.  What are your duties there -- let's do it this way.  I'm

1   sorry.  From the time you became manager until today have your
2   duties been the same?
3   A.   It could have changed, but mostly, the most important thing
4   is just to keep the records for the employees and make sure
5   that they get their hours.  I make sure the time they come in
6   and the time they leave.  That's like the most important thing
7   to me.
8   Q.   Let's talk about methodology.  How do you keep track of the
9   employees' time?
10  A.   There was a time clock that they would punch in, and then
11  in 2013, 2014 we started punching in in the POS service.
12  Q.   Is that computerized?
13  A.   Yes.
14  Q.   Do you know the plaintiffs in this action?
15  A.   Yes.
16  Q.   Do you know Alejandro Valle?
17  A.   Yes.
18  Q.   Do you know Edgar Cid?
19  A.   Yes.
20  Q.   Do you know that he's also known as Daniel Lopez?
21  A.   Yes.
22  Q.   Do you know them personally?
23  A.   Yes.
24  Q.   Do you recognize them in this courtroom?
25  A.   Yes.

Gb3nval2                        Garzon - direct

1    Q.  Could you point them out to us?

2    A.  Right there.

3    Q.  From the time that each of them began their employment with

4    either company called Hakata, did you know them?

5    A.  Yes.

6    Q.  Did you know them personally?

7    A.  Alejandro Valle only, and then Daniel Lopez when he started

8    working there.

9    Q.  OK.  Did you give them their work assignments?

10   A.  Yes.  I mean, I would say at the beginning not me

11   personally, but there was the chef in charge of the delivery

12   guys.

13   Q.  How long did that last?

14   A.  One year probably.

15   Q.  From when to when?

16   A.  From December 2008 to December 2009, maybe January 2010.

17   Q.  And personally what are your hours?

18            THE COURT:  I'm sorry.  I didn't understand.

19            What is it that lasted that period?

20            THE WITNESS:  January 2010.

21            THE COURT:  What is it that happened during that

22   period?

23            THE WITNESS:  He asked me if I would come at that time

24   early.

25            THE COURT:  Well, what did you think you -- you were

1   saying that from that period you came in early?

2            Is that what you are saying?

3            THE WITNESS:  No.

4            THE COURT:  What happened during that period?

5            THE WITNESS:  The chef used to take care of the

6   duties.

7            THE COURT:  So that was the period when the chef was

8   in charge of the delivery people?

9            THE WITNESS:  Right.

10            THE COURT:  All right.

11            MR. FERST:  May I?

12            THE COURT:  Yes.

13   BY MR. FERST:

14   Q.  Personally what are your duties at Hakata?

15   A.  I come every day at 9 a.m. and I leave 9, 10, whenever it's

16   time to go home.

17   Q.  Is that true today?

18   A.  No, not now.  Right now, the times have changed and now we

19   are doing mostly catering.  We don't do the deliveries anymore.

20   Q.  How about the times during which the plaintiffs were

21   employed?

22   A.  I used to leave at 9.

23   Q.  And you still arrived at what time?

24   A.  9 a.m.

25   Q.  OK.  Is it fair to say that you were on the premises at all

Gb3nval2                          Garzon - direct

1   times that the plaintiffs were on the premises?

2   A.  Yes.

3   Q.  After the chef stopped giving them their work assignments,

4   did you give them their work assignments?

5   A.  Yes.

6   Q.  Now, have you heard testimony that they worked more than

7   ten hours a day?

8   A.  No.

9   Q.  Did you not hear them say that this morning?

10  A.  Yes, I heard that.  I'm sorry.

11          MR. CLARK:  Objection.

12          THE COURT:  The objection is that, is it they

13  testified ten hours, but not more.

14          Is that the objection?

15          MR. CLARK:  Yes.  The beginning and end times are at

16  issue, but I don't think that more than ten hours is at issue.

17          THE COURT:  This is no need to ask him about testimony

18  anyway.

19          MR. FERST:  I withdraw it.

20          Let me ask this question.

21  BY MR. FERST:

22  Q.  Do you have personal knowledge of from when to when the

23  plaintiffs worked?

24  A.  You mean during the day or for how long they worked?

25  Q.  Any knowledge you have.

Gb3nval2                    Garzon - direct

1   A.  Well, Daniel Lopez started working in I would say like

2   September 2008 and then he left us about maybe March or April

3   of 2014.

4   Q.  Aside from the time you have testified to about the chef,

5   did you supervise his work assignments?

6   A.  Yes.

7   Q.  Did you keep track of his arrival at the premises?

8   A.  Yes.

9   Q.  Did you keep track of his departure from the premises?

10  A.  Yes.

11  Q.  I think you mentioned that there was a clock-in system.

12  A.  Yes.

13  Q.  The clock-in system, was that in existence when he started

14  to work?

15  A.  Yes.

16  Q.  When it was replaced by what you have called the POS

17  system, were you there?

18  A.  Yes.  I did it myself.  I set it up.

19  Q.  Is it fair to say that you were personally aware of the

20  time that each, the hour at which each plaintiff arrived?

21  A.  Yes.

22  Q.  Is it fair to say that at all times you were personally

23  aware of when each plaintiff left?

24  A.  Yes.

25  Q.  Is it fair to say that at all times you were personally

1   aware of when these plaintiffs had time that they weren't

2   working, for example, lunch?

3   A.  Yes.

4   Q.  Tell us about lunch.

5   A.  Well, we used to have the system that when it's a slow time

6   they would have their lunch, and they would take off some time.

7   Q.  Was there ever a time that either plaintiff was on the

8   premises for more than ten hours a day with or without a break?

9   A.  No.

10  Q.  You know that from your personal knowledge?

11  A.  Yes.

12  Q.  Now, let me ask you, did you play any part in the

13  preparation of their compensation, of their work checks?

14  A.  Yes.

15  Q.  First of all, were they always paid by check?

16  A.  Yes.

17  Q.  Were there tips?

18  A.  Yes.

19  Q.  Tell us how the tips were paid.

20  A.  The tips were paid in cash and every day.

21  Q.  What was the system of paying --

22  A.  The system is that they would pool and they would share it

23  evenly.

24  Q.  Explain what pool means?

25  A.  There were like five guys, sometimes four guys, seven guys,

Gb3nval2                    Garzon - direct

1    there were different times.  And they were always pooled, they

2    were always pooling, and then they would share it evenly with

3    the six or seven guys, whatever they were, there.

4    Q.  And how were the tips paid?

5    A.  Cash.

6    Q.  And who paid that cash?

7    A.  Myself.

8    Q.  And how did you get the cash to pay the tips?

9    A.  From the president of the company.  I would get the check

10   and I would cash it myself.

11   Q.  And that check was payable to whom?

12   A.  It was just cash.

13   Q.  So you would go to the bank?

14   A.  Yes.

15   Q.  And you said I believe that the tips were paid on a daily

16   basis?

17   A.  Yes.

18   Q.  Tell us what else you did to participate in getting the

19   checks ready for payment to the plaintiffs?

20             THE COURT:  I'm completely confused about the tips and

21   the source of the tips.  I would have thought tips came from

22   customers out at a delivery.  I don't know how a check got

23   involved, and it's complete confusion to me.

24             I'm happy to clear it up, or you can clear it up.

25             MR. FERST:  Please, your Honor.

Gb3nval2                           Garzon - direct

1            THE COURT:  OK.

2            Sir, so you say they pooled tips?

3            THE WITNESS:  Right.

4            THE COURT:  Where did the money come from that was

5     being put in the pool?

6            THE WITNESS:  From our boss, because most of the tips

7     were on credit cards.

8            THE COURT:  OK.

9            THE WITNESS:  So there was no cash.

10           THE COURT:  If the customer gave a cash tip, did the

11    delivery person keep that?

12           THE WITNESS:  Yes.

13           THE COURT:  OK.  If they had a credit card tip, how

14    would you learn and at what point would you learn how much tip

15    all the customers that day had given in credit card tips?

16           THE WITNESS:  Because I would run the report of the

17    day.

18           THE COURT:  You could run it at the end of the day?

19           THE WITNESS:  Yes.

20           THE COURT:  You could run a report that tells you

21    exactly how much tip?

22           THE WITNESS:  Yes.

23           THE COURT:  At the end of the day, give me an example

24    of a number that might be the total amount of tips for that

25    day.

Gb3nval2                          Garzon - direct

1          THE WITNESS:  It could have been $200, $300 a day.

2          THE COURT:  Let's say it's $300.  Let's say you have

3     five delivery people.  What's happens --

4          THE WITNESS:  I would give $60 each.

5          THE COURT:  No.  What happens?

6          You run the report.  What happens?

7          THE WITNESS:  I would run the report and I would just

8     divide it.

9          THE COURT:  You would?

10         THE WITNESS:  Divide it.

11         THE COURT:  So you know that they are each entitled to

12    $60?

13         THE WITNESS:  Right.

14         THE COURT:  Then what would you do?

15         THE WITNESS:  I would give it to them.

16         THE COURT:  In what form?

17         THE WITNESS:  Cash.

18         THE COURT:  I thought you told me something about a

19    check being involved in this.

20         THE WITNESS:  No.  I would get the check myself from

21    the president.

22         THE COURT:  What check?

23         THE WITNESS:  A cash check.

24         THE COURT:  Let's back up then.

25         You run the report, and you find out that it's $300 in

1    tips.

2              What do you do next?

3              THE WITNESS:  I will always have cash from the

4    president.

5              THE COURT:  You would have cash?

6              THE WITNESS:  Yes, from the president.

7              THE COURT:  Hold on.  Stop.

8              When you say from the president, what does that mean?

9              THE WITNESS:  From the president of the corporation.

10             THE COURT:  OK.

11             THE WITNESS:  From the owner.

12             THE COURT:  It's the end of the day.

13             What time of day is it?

14             THE WITNESS:  No.  It's not that I would give them

15   that day.  I would give them like the next morning for the day

16   before.

17             THE COURT:  I want to know exactly how you did it.  So

18   tell me, what time of day did you run the report?

19             THE WITNESS:  After lunch.

20             THE COURT:  It was for the previous day?

21             THE WITNESS:  For the previous day, yes.

22             THE COURT:  OK.  You run the report, and the report

23   says $300.

24             THE WITNESS:  Right.

25             THE COURT:  What do you do next?

Gb3nval2                          Garzon - direct

1              THE WITNESS:  I would get the cash and just give it to

2       them.

3              THE COURT:  How do you get the cash?

4              THE WITNESS:  I get it always in advance.  Like every

5       week I got one check in advance for me to give them every day

6       cash.

7              It's not like I run the report and then I go to the

8       president and that is where the cash.  I go and get some cash

9       in the bank.

10             THE COURT:  OK.  So you always have a certain amount

11      of cash on hand?

12             THE WITNESS:  Yes.

13             THE COURT:  And the way you get the cash is you get a

14      check from the owner?

15             THE WITNESS:  Yes.

16             THE COURT:  You cash that check?

17             THE WITNESS:  Yes.

18             THE COURT:  Do the workers ever see that check?

19             THE WITNESS:  No.

20             THE COURT:  All right.

21      BY MR. FERST:

22      Q.  Just to clarify, the check you got from the owner that you

23      used for the cash to pay the tips, to whom was that check

24      payable?

25      A.  It was just as cash.

Gb3nval2                          Garzon - direct

```
 1   Q.  Were the tips given to plaintiffs or the employees

 2   reflected on their check stubs?

 3   A.  Yes.

 4   Q.  All right.  Now let's talk about your role in preparing the

 5   information that resulted in the checks.

 6             Who created the checks physically?

 7   A.  The payroll company.

 8   Q.  Who gave you instructions about what methodology to use to

 9   keep records?

10   A.  I have a form that I get from the payroll company, and then

11   I just write down the hours because I have all the employees

12   and that are working with us at that moment.  Then I would

13   report the tips and then I would just e-mail it.

14   Q.  To whom?

15   A.  To the president.

16   Q.  Did there come a time when you actually got the checks

17   physical checks?

18   A.  Yes.

19   Q.  How did you get those checks?

20             THE COURT:  I don't know what checks we are talking

21   about.

22             MR. FERST:  Payroll checks.

23             THE WITNESS:  Payroll checks.

24             I used to come to get them at the office.

25             THE COURT:  OK.  Let's back up.
```

Gb3nval2                    Garzon - direct

1           So, in a given week, do you have a record of hours?

2           THE WITNESS:  Yes.

3           THE COURT:  That record comes from where?

4           THE WITNESS:  From the POS system.

5           THE COURT:  How about before you had the POS system?

6           THE WITNESS:  I used to count the hours.

7           THE COURT:  You would write it down?

8           THE WITNESS:  Yes.

9           THE COURT:  OK.  And you transmit that to the payroll

10    company?

11           THE WITNESS:  Yes, to the president, and then he would

12    send it to the payroll company.

13           THE COURT:  You gave it to the president?

14           THE WITNESS:  Right.

15           THE COURT:  OK.  You included the information as to

16    the number of hours?

17           THE WITNESS:  The number of hours and tips.

18           THE COURT:  How much tip --

19           THE WITNESS:  Right.

20           THE COURT:  -- was given to each employee?

21           THE WITNESS:  Right.

22           THE COURT:  That was for a whole week?

23           THE WITNESS:  Yes.

24           THE COURT:  How did you know how much ways given for

25    that employee?

Gb3nval2                          Garzon - direct

1                THE WITNESS:  I used to keep a book.

2                THE COURT:  Where you wrote down how much tip they

3        got?

4                THE WITNESS:  Yes, every day.  Yes.

5                THE COURT:  OK.  The payroll company would generate

6        checks?  Is that what happened?

7                THE WITNESS:  Yes.

8                THE COURT:  What day of the week did you transmit this

9        information?

10               THE WITNESS:  On Monday.

11               THE COURT:  For --

12               THE WITNESS:  The week was from Monday to Sunday, and

13       on Monday morning I would count all the hours, I mean count the

14       tips, too, the report on the tips, and I would send it out.

15               THE COURT:  When would the checks arrive from the

16       payroll company?

17               THE WITNESS:  Wednesday or Thursday, and I would give

18       it out on Friday.

19               THE COURT:  That was for --

20               THE WITNESS:  For the previous week.

21               THE COURT:  Go ahead.

22               MR. FERST:  OK.

23       BY MR. FERST:

24       Q.  Now, when you got the checks, how did you get them?

25       A.  I used to come to the office and pick them up.

1              MR. FERST:  I'm sorry, your Honor, but this is

2      pertinent.

3      BY MR. FERST:

4      Q.  Did you hear testimony that one of the plaintiffs was sent

5      to get the checks?

6      A.  There would be a couple of times when I know that they

7      would be dropping some food by the office, and I would ask them

8      to just pass by and pick up the checks.

9      Q.  Was that a couple of times.

10     A.  Yeah, a couple of times.

11     Q.  And the rest of the time how did you get the checks.

12     A.  I used to come myself.

13     Q.  When you got the checks, did you examine them?

14     A.  Yes.

15     Q.  Please describe the checks to us physically.

16     A.  Well, these are paper, the size, letter size, and then they

17     would be the check and they would be the stub.

18     Q.  What information was on the stub?

19     A.  On the stub would be showing the hours they worked the

20     previous week and how much tips they made.

21             MR. FERST:  Your Honor, I think this is an appropriate

22     time to ask the witness to review what's been stipulated to be

23     in evidence.

24             May I approach?

25             THE COURT:  You may.

Gb3nval2                          Garzon - direct

1   BY MR. FERST:

2   Q.  Mr. Garzon.

3   A.  Yes.

4   Q.  Could you turn your attention to the folder that you have

5   been handed.

6   A.  Right.

7   Q.  OK.  Please go to Exhibit A.

8   A.  OK.

9   Q.  Tell us if you have seen that before.

10  A.  Yeah.  That's the checks they would get every week.

11  Q.  OK.  Is this dedicated to one of the plaintiff's, Exhibit

12  A?

13  A.  Yes.

14  Q.  To which plaintiff?

15  A.  Daniel Lopez.

16  Q.  OK.  Do you see that it says Balverde Lopez?

17  A.  Yes.

18  Q.  Was he also known by that name?

19  A.  I used to know him by this name first.

20          THE COURT:  This is Mr. Cid, right?

21          THE WITNESS:  Yes.

22  Q.  Is the top part a reproduction of the check?

23  A.  Yes.

24  Q.  And the bottom part, is that the stub you've described?

25  A.  Yes.

1   Q.  Please review it and tell us what information concerning

2   tips you see on that?

3   A.  On the tips I see that it was $100 on that day -- on that

4   week, and 27 hours and a half.

5   Q.  OK.  If you go through all of these, all of Exhibit A, is

6   it fair to say that they all deal with Mr. Cid?

7   A.  Yes.

8   Q.  OK.  Please look at Exhibit B.

9   A.  Yes.

10  Q.  Have you seen the pages that comprise Exhibit B before?

11  A.  Yes.

12  Q.  And is it true that it's also a reproduction of a check and

13  the stub?

14  A.  Yes.

15  Q.  All right.  And please turn your attention to Exhibit C.

16  A.  OK.

17  Q.  Is it fair to say that that also deals with Balverde Lopez?

18  A.  Yes.

19  Q.  Who is Mr. Cid?

20  A.  Yes.

21  Q.  Does that also constitute on each page a reproduction of

22  the check and the stub?

23  A.  Yes.

24  Q.  All right.  Exhibit D, is it fair to say that that deals

25  with Alejandro Valle?

Gb3nval2                        Garzon - direct

1   A.  Yes.

2   Q.  And the same question about Exhibit E.

3   A.  Yes.

4   Q.  Now, in each case, is there a reproduction of a check and a

5   reproduction of the stub?

6   A.  Yes.

7   Q.  When you got the checks in the time frame you have already

8   described, did you examine the checks and the stubs?

9   A.  Yes.

10  Q.  What did you examine them for?

11  A.  Mostly the hours and the tips.

12  Q.  And did you make sure that they complied with the notes

13  that you had --

14  A.  Yes.

15  Q.  -- given the payroll company?

16  A.  Yes.

17  Q.  Did they comply with those notes?

18  A.  Yes.

19  Q.  Now I want you to turn to Exhibit F.

20  A.  Yes.

21  Q.  Tell us what Exhibit F is?

22  A.  This is the report of all the employees that were working

23  on that week.

24  Q.  All right.

25  A.  Mostly.

1    Q.  The report pertains to Balverde Lopez and Alejandro Valle,

2    do you see that let's say on the first page of Exhibit F?

3    A.  Yes.

4    Q.  All right.  Now, have you examined these documents that

5    complies Exhibit F?

6    A.  When I got them, yes.

7    Q.  OK.  Does the information in Exhibit F correspond to the

8    information on the check stubs for the same period of time?

9    A.  Which?  That would be Exhibit A?

10   Q.  Any one?

11   A.  Any one.  Oh.  I would say yes.

12   Q.  If I ask you the same questions about Exhibits G and H.

13   A.  G and H, yes.  It's just more reports for just different

14   years I guess.

15   Q.  But does the information --

16   A.  Yes.

17   Q.  -- on the reports --

18            Let me finish, please.

19            Does the information on the reports, Exhibit F, G and

20   H, correspond to the information on the check stubs?

21   A.  Yes.

22   Q.  Have you had a chance to review the check stubs and the

23   registers concerning the question of overtime?

24   A.  Yes.

25   Q.  All right.  Now, is it fair to say that there was overtime?

Gb3nval2                          Garzon - direct

1    A.  Yes, sometimes.

2    Q.  When there was overtime, was that written down?

3    A.  Yes.

4    Q.  And was that paid?

5    A.  Yes.

6    Q.  Explain to us at what rate.

7    A.  When there's only for delivery, it would be -- like it

8    depends on the year, because the rates keep changing, but it's

9    always time and a half.

10   Q.  And was that always complied with?

11   A.  Yes.

12   Q.  Did you make sure it was complied with?

13   A.  Yes.

14   Q.  Is it true that the plaintiffs spent time doing nondelivery

15   work?

16   A.  Yes.

17   Q.  And were they paid for that work?

18   A.  It was trying to be careful.  If it was over an hour, I

19   would pay them on a different check.

20   Q.  Explain what you mean?

21   A.  I would run a -- depending on how many hours they would

22   work, because first it was only delivery and then we started

23   changing eventually to catering and then I would need them for

24   a couple of hours, so I would pay them $11 an hour.

25   Q.  When they worked overtime as deliverymen or delivery

1   people, were they paid time and a half?

2   A.  Yes.

3   Q.  And at what rate were they paid time and a half?

4   A.  Like 8, 8.75 I guess.

5   Q.  Was it time and a half?

6   A.  Right.

7   Q.  Was there ever a time that they worked overtime doing

8   nondelivery?

9   A.  No.

10  Q.  Is it true that they worked overtime without being paid

11  overtime?

12  A.  No.

13  Q.  Is it true that they or some of them at times worked 50

14  hours a week?

15  A.  If they worked they got paid.

16  Q.  Let me ask the question this way.  Is it true that if they

17  worked more than 40 hours a week that that was not reflected on

18  the checks?

19  A.  No.

20  Q.  Is it true that if they worked more than 40 hours a week

21  they were compensated on the checks?

22  A.  Yes.

23          MR. CLARK:  Objection.

24          THE COURT:  The objection is?

25          MR. CLARK:  I am allowing a certain amount of leading

1   on these kind of questions.

2            THE COURT:  Speak up.

3            Stand when you are addressing the Court.

4            MR. CLARK:  Yes, your Honor.

5            We have had a series of leading questions at this

6   point.

7            THE COURT:  Objection.  Leading.  Sustained.

8            Go ahead.

9   BY MR. FERST:

10  Q.  Mr. Garzon, what was your methodology in keeping track of

11  overtime?

12  A.  Well, as I said, I always had the POS server, and I would

13  just print the report, and it would just -- I would print the

14  report weekly, like I would go Monday through Sunday, and then

15  the hours just come off and I would just report it from there.

16  Q.  I want you to turn your attention to -- let's see,

17  September 3 of 2010 concerning Mr. Lopez.

18  A.  September '10?

19  Q.  September 3, 2010?

20            THE COURT:  What exhibit are we?

21            MR. FERST:  Exhibit B, page 88, your Honor.

22  A.  Page 88, yes.

23  Q.  Do you see any reference to overtime there?

24  A.  Yes.

25  Q.  Tell us what that reference is.

1    A.  It says 40 hours regular, regular rate, and then 17 hours

2    and a half at 6.98, which would be the overtime rate.

3    Q.  Please turn your attention to Exhibit C, page 108.

4    A.  Yes.

5    Q.  And Exhibit C, page 109.

6    A.  Yes.

7    Q.  Tell us what it says about overtime.

8    A.  It is 40 hours at the regular rate, which is 5; and 4 hours

9    at overtime rate, which is seven and a half.

10   Q.  Please turn your attention to Exhibit C at page 157.

11   A.  Yes.

12   Q.  And do you see any reference there to overtime?

13   A.  Yes, three hours at 7.50.

14   Q.  Are you telling us from your personal knowledge that every

15   time there was overtime it was memorialized and put into the

16   payment system?

17   A.  Yes.

18   Q.  And that was done by you, was it?

19   A.  Yes.

20   Q.  And when you got the checks, your testimony is that you

21   examined them?

22   A.  Yes.

23   Q.  And at all times did your notes comply with the final

24   product of the payroll check?

25   A.  Yes.

Gb3nval2                          Garzon - direct

1   Q.  What happened to the stubs when you gave them the checks?

2   A.  I would give it to them.

3   Q.  Did they ever question you about it?

4   A.  No.

5   Q.  Is it your testimony that every single check which every

6   plaintiff got had a stub attached to it?

7   A.  Yes.

8   Q.  Now, turn your attention please to Exhibit F.  Page 214.

9   A.  Page 214?

10  Q.  Yes.  Do you see any reference there to overtime?

11  A.  For Alejandro Valle.

12  Q.  And tell us what it says.

13  A.  One hour at 8.48.

14  Q.  Please turn your attention to page 250.

15  A.  Yes.

16  Q.  Tell us what you see.

17  A.  I have for Lopez 40 hours regular, and 11 hours and a half

18  at overtime.

19  Q.  Turn your attention to page 218.

20  A.  Yes.

21  Q.  What do you see?

22  A.  I have for Lopez 40 hours regular time and 10 hours and a

23  half overtime; and Valle, I have 40 hours regular time and nine

24  and a half hours overtime.

25  Q.  So, without going through the rest of the documents, is it

Gb3nval2                        Garzon - direct

1   fair to say that each time there was overtime it was noted?

2           MR. CLARK:  Objection.

3   A.  Yes.

4           THE COURT:  Try not to lead, Mr. Ferst.

5   Q.  Turn your attention please, to Exhibit H.

6   A.  What page?

7   Q.  Exhibit H, 325.

8   A.  325.  Yes.

9   Q.  Do you see any reference to overtime?

10  A.  Yes.  For Lopez it's 40 hours and eight and a half

11  overtime; and Valle 40 hours and six and a half overtime.

12  Q.  Did something change in 2014 in terms of the business?

13  A.  Yes, we started doing more catering, so we stopped the

14  deliveries for a couple of hours when we had to take care of

15  the catering events.

16  Q.  Is it true that the plaintiffs delivered the catering?

17  A.  No.

18  Q.  Who delivered the catering?

19  A.  We have a driver and we have the chefs.  They would go

20  personally to make the sushi there.

21  Q.  Turn your attention please to October 5 of 2014.

22  A.  Is that another page?  Do you have it?

23  Q.  376.

24  A.  376.

25          THE COURT:  376?

1           THE WITNESS:  Yes.

2    Q.  Any reference to overtime there?

3    A.  I have Valle, four hours at $11 rate.

4    Q.  And 374?

5           THE COURT:  I'm sorry.

6           Is there a suggestion this is overtime?

7           THE WITNESS:  No.  This is when I used to need them

8    for catering, I used to pay them at $11 an hour.

9           THE COURT:  OK.

10   A.  At what page?

11   Q.  All right.  Aside from the tip payments which you have

12   described in cash, were any other payments made to the

13   plaintiffs in cash at any time?

14   A.  No.

15   Q.  Was overtime always paid to them?

16   A.  Yes.

17   Q.  Was there ever a time that they were on the premises,

18   working or not, for more than 10 hours?

19   A.  They would take a break for two hours sometimes, one hour

20   and a half.

21           MR. FERST:  I have no further questions.

22           MR. CLARK:  Very brief cross, your Honor.

23   CROSS EXAMINATION

24   BY MR. CLARK:

25   Q.  Good afternoon, Mr. Garzon.

Gb3nval2                      Garzon - cross

1   A.  Good afternoon.

2   Q.  You testified earlier that you managed records for the

3   restaurant, is that correct?

4   A.  Yes.

5   Q.  You testified that you were responsible for maintaining

6   time records at the restaurant, right?

7   A.  Yes.

8   Q.  I believe you testified that they used a time clock since I

9   believe 2008?  And feel free to correct me if that's wrong.

10  A.  Yes.

11  Q.  The time clock, are you saying that delivery workers would

12  use the time clock every day when they would come in?

13  A.  Yes.

14  Q.  Are you testifying that the delivery workers would use the

15  time clock every day when they would leave at the end of the

16  day?

17  A.  Yes.

18  Q.  And are you testifying that you would keep those records?

19  A.  Yes.

20  Q.  You don't have those time records anymore, do you?

21  A.  Not right here.

22          THE COURT:  Sorry.  What did you say?

23          THE WITNESS:  Not right here.

24          THE COURT:  Do you have them somewhere?

25          THE WITNESS:  No.  Actually because -- no.

Gb3nval2                          Garzon - cross

1   BY MR. CLARK:

2   Q.  So those time records don't exist anymore, right?

3   A.  No.

4   Q.  They haven't existed for sometime, right?

5   A.  I would say maybe a couple of years.

6   Q.  OK.  So you knew that these were records of your employees'

7   time, but you didn't bother keeping track of them?

8   A.  No, I didn't keep them for that many years.

9   Q.  Great.  You understand that New York state law requires

10  that businesses maintain time records for their employees,

11  right?

12  A.  Well, you are telling me now.  I didn't know.

13  Q.  And you never provided employees any kind of written notice

14  when their rate of pay would change, did you?

15  A.  Written notice, no.

16  Q.  You never provided any written notice about what it means

17  to take a tip credit, did you?

18  A.  What do you mean tip credit?

19  Q.  Yes or no, do you know what a tip credit is?

20  A.  No.

21  Q.  And do you ever provide a written notice about a meal

22  credit?

23  A.  No.

24  Q.  Now, you testified I believe earlier that you would receive

25  certain checks from the president of the company, right?

Gb3nval2                          Garzon - cross

1   A.  Right.

2   Q.  Is that president you are referring to Mr. Wartski in this

3   case?

4   A.  Yes.

5   Q.  And you would report to Mr. Wartski, right?

6   A.  Yes.

7   Q.  And Mr. Wartski is your boss?

8   A.  Yes.

9   Q.  And Mr. Wartski could give you orders concerning what to do

10  at Hakata Grill, right?

11  A.  Most of the time I was dealing -- what kind of orders do

12  you refer to?

13  Q.  He would be your supervisor, right?

14  A.  It depends on what area.

15  Q.  Excuse me.

16  A.  What kind of area?  You are saying supervising what kind of

17  area because --

18          THE COURT:  Who was your boss?

19          THE WITNESS:  Mr. Wartski.

20  Q.  And he would keep track of the payroll with you, correct?

21  A.  Yes.

22  Q.  He was responsible for paying out cash and checks and the

23  like at the restaurant, right?

24  A.  Yes.

25  Q.  And he hired you, correct?

1   A.  Yes.

2   Q.  And he would, if he wanted to, have the capacity to fire

3   you, correct?

4   A.  Yes.

5   Q.  And if he asked that any change be made at the restaurant,

6   you would work to bring about that change, correct?

7   A.  I didn't get your question.

8   Q.  If he required anything to change at the restaurant and

9   asked you to, you would do it, right?

10  A.  Yes.

11          MR. CLARK:  No further questions, your Honor.

12          MR. FERST:  Redirect?  May I redirect.

13          THE COURT:  Yes.

14  REDIRECT EXAMINATION

15  BY MR. FERST:

16  Q.  Mr. Garzon, did Mr. Wartski ever tell you to lie?

17  A.  No.

18  Q.  Did Mr. Wartski ever tell you to alter records?

19  A.  No.

20  Q.  Did Mr. Wartski ever tell you, I don't care how long these

21  guys worked, I want it to say 40 hours?

22  A.  No.

23  Q.  Have you lied about anything you told us here?  About

24  anything?

25  A.  No.

Gb3nval2                          Garzon - redirect

1           MR. FERST:  Thank you.

2           THE COURT:  Mr. Clark, anything?

3           MR. CLARK:  No further questions, your Honor.

4      Thank you.

5           THE COURT:  I am trying to understand the system for

6      recording time before you had the computerized system.

7           What did it look like?

8           THE WITNESS:  It was a clock.  Then they would just

9      put the card and just punch in, and they would have the hours

10     written there, printed actually.

11          THE COURT:  Printed?

12          THE WITNESS:  Yes.

13          THE COURT:  And who was responsible for maintaining

14     the clock?

15          THE WITNESS:  Me.

16          THE COURT:  Did the clock ever break down?

17          THE WITNESS:  A couple of times.  I had to buy like

18     two of them.

19          THE COURT:  OK.

20          Did the clock indicate a date and a time --

21          THE WITNESS:  Yes.

22          THE COURT:  -- let me finish my sentence.

23          THE WITNESS:  Sorry.

24          THE COURT:  A date and time or just a time?

25          THE WITNESS:  No, a date and time.  Actually, it was

Gb3nval2                          Garzon - redirect

1    the day, the date, and the time.

2              THE COURT:  What did they use to insert in the clock?

3              THE WITNESS:  They used the special cards.  The same

4    company sends them, and then you just give you like four spots

5    for the day.

6              THE COURT:  How many spots?

7              THE WITNESS:  Four.

8              THE COURT:  Why four?

9              THE WITNESS:  They just made them like that.

10             THE COURT:  So if you have a five-day week, you would

11   have to use more than one card for that week.

12             THE WITNESS:  No, I said like four spots for the one

13   day, and then it was like for seven days.

14             THE COURT:  Oh, four different time spots?

15             THE WITNESS:  Right.  For the day.

16             THE COURT:  So you could clock in and out twice?

17             THE WITNESS:  Right.

18             THE COURT:  These two individuals Mr. Cid and Mr.

19   Valle, did they regularly leave in the middle of the day and

20   then return?

21             THE WITNESS:  There was a time that, yes.

22             THE COURT:  Did they always do that, or just

23   sometimes?

24             THE WITNESS:  I would say most of the time.

25             THE COURT:  They left and then returned?

Gb3nval2                         Garzon - redirect

```
 1                    THE WITNESS:  Right.

 2                    THE COURT:  When they did that, would they clock in

 3    and clock out.

 4                    THE WITNESS:  Yes.

 5                    THE COURT:  So you had four time entries?

 6                    THE WITNESS:  Right.

 7                    THE COURT:  Would the time entries show the exact

 8    minute?

 9                    THE WITNESS:  Yes.

10                    THE COURT:  How many employees used the clock?

11                    THE WITNESS:  There was times -- there was like 20,

12    15, 10.

13                    THE COURT:  OK.  And who was responsible for recording

14    the hours?

15                    THE WITNESS:  I am responsible.

16                    THE COURT:  Let me finish my sentence.  Who was

17    responsible for recording the hours reflected on the time

18    cards.

19                    THE WITNESS:  I was responsible.

20                    THE COURT:  Always you?

21                    THE WITNESS:  Yes.

22                    THE COURT:  How long did it take you to do that?

23                    THE WITNESS:  One hour.

24                    THE COURT:  One hour?

25                    THE WITNESS:  Yes.
```

Gb3nval2                              Garzon - redirect

1              THE COURT:  You did it for all 20 employees?

2              THE WITNESS:  Yes.

3              THE COURT:  And the employees generally worked five

4     days a week?

5              THE WITNESS:  Yes.

6              THE COURT:  Were you open on Saturdays?

7              THE WITNESS:  There was a time, yes, that we were open

8     on Saturdays.

9              THE COURT:  When did you close.

10             THE WITNESS:  I would say 2010 we closed Saturdays and

11    Sundays.

12             THE COURT:  Did most employees clock in and out at one

13    point during the day, or just some of them?

14             THE WITNESS:  Some of them.

15             THE COURT:  How many?

16             THE WITNESS:  We had around five, six, maybe seven

17    guys that they worked only dinnertime.  So they would work like

18    half the day.

19             THE COURT:  Were 15 of them clocking in and out during

20    the day?

21             THE WITNESS:  Right.

22             THE COURT:  When you took the hours from the time

23    cards, you said it took you about an hour, right?

24             THE WITNESS:  Right.

25             THE COURT:  What did you do with that information?

1    Did you write it down?

2            THE WITNESS:  Yes.  I had a form for the payroll

3    company, and I would write down the hours.

4            THE COURT:  What did the form look like?

5            THE WITNESS:  Something like that.

6            THE COURT:  Describe it to me.

7            It had the names?

8            THE WITNESS:  Yeah.  It has the names, and then it has

9    one slot for the names and then one for the regular time, for

10   the overtime, the dates.  And I guess that's about it.

11           THE COURT:  Did you have to record each day, or was it

12   for the week?

13           THE WITNESS:  No, weekly.

14           THE COURT:  Here's what I am wondering about, sir.

15           It seems to me that this is a very big job.

16           THE WITNESS:  It is.

17           THE COURT:  I am surprised you could do it in an hour.

18           Let me tell you why, and you tell me what I'm missing.

19           It seems to me you've got 20 employees.  They've got

20   times -- I assume they don't arrive exactly at 10.

21           THE WITNESS:  Yes.

22           THE COURT:  They arrive at 9:52, they leave at 4:03.

23           Were you recording the time to the minute or no?

24           THE WITNESS:  Not to -- each 15 minutes.  If they

25   leave 15 minutes after the time they were supposed to leave,

Gb3nval2                           Garzon - redirect

1   then I would add 15 minutes.

2              THE COURT:  So if someone clocks in at 9:59 and clocks

3   out at 3:28 what do you put down?

4              THE WITNESS:  I'm sorry?

5              THE COURT:  9:59 to 3:28?

6              THE WITNESS:  9:59 to 3:28, that will be five hours.

7              THE COURT:  You would clock that as five hours?

8              THE WITNESS:  Right.

9              THE COURT:  Because you take off the 28 minutes?

10             THE WITNESS:  No.  I actually I put it in, right.

11             THE COURT:  Take your time.

12             I can write it down if you want.

13             THE WITNESS:  Six hours -- actually, five and a half.

14             THE COURT:  Five and a half?

15             THE WITNESS:  Five and a half, yes.

16             THE COURT:  If they clocked in -- I'll write it down

17   for you.

18             THE WITNESS:  Yes.

19             THE COURT:  If they clock in at 9:45 and clock out at

20   1:25, and they clock in at 3:41 and clock out at 9:50, I want

21   you to take your time, sir and tell me how many hours you would

22   put down for that.

23             THE WITNESS:  Thank you.  9:50.

24             THE COURT:  Nine hours fifty minutes?

25             THE WITNESS:  Nine forty-five.

1          MR. CLARK:  Nine hours forty-five minutes you would do

2     for that.

3          Did you have to do something like this for every

4     single employee?

5          THE WITNESS:  Yes.

6          THE COURT:  You had to do it for five days a week?

7          THE WITNESS:  No.  Once a week.

8          THE COURT:  ,Well you had to do it for five different

9     entries like this, didn't you?

10          THE WITNESS:  Right.

11          THE COURT:  So you had to do this little exercise a

12     hundred times, is that right?

13          THE WITNESS:  About, yes.

14          THE COURT:  In the space of one hour?

15          THE WITNESS:  Yes.

16          THE COURT:  You were able to do that.

17          THE WITNESS:  Yes.

18          THE COURT:  Were there some employees who didn't want

19     to clock in and clock out?

20          THE WITNESS:  Yeah.  Some of them, they would forget,

21     but I would push them to.  That was like a little bit of a

22     headache to me.

23          THE COURT:  The record that got produced, the only

24     record that you have of this, of the actual clock in and clock

25     out hours, is the actual time card, is that right?

Gb3nval2                              Garzon - redirect

1              THE WITNESS:  Right.

2              THE COURT:  Because you then transferred it to the

3     payroll department, is that right?

4              THE WITNESS:  Right.

5              THE COURT:  Where did you keep those time cards.

6              THE WITNESS:  I would keep them at the office.

7              THE COURT:  How long did you keep them?

8              THE WITNESS:  Four years I would say.

9              THE COURT:  Four years?

10             THE WITNESS:  Yes.

11             The thing is they moved office, and then in the way

12    they got lost.

13             THE COURT:  They got lost at one point?

14             THE WITNESS:  Right.  At one point, yes.

15             THE COURT:  Did you ever have a sign-in system for

16    hours?

17             THE WITNESS:  Sign-in system, no.

18             THE COURT:  Always the clock?

19             THE WITNESS:  Always the clock.

20             THE COURT:  What's the difference between this payroll

21    register which we have here, Exhibit H, and some other

22    exhibits?

23             How did that get generated?

24             THE WITNESS:  Which one?  I'm sorry.

25             THE COURT:  The payroll register.  You can look at

Gb3nval2                           Garzon - redirect

 1   Exhibit H, for example.

 2              THE WITNESS:  Exhibit H.  This one is the one the

 3   payroll company would return to me.

 4              THE COURT:  They returned to you the checks, though,

 5   didn't they?

 6              THE WITNESS:  The checks and this report.

 7              THE COURT:  Those are the two reports you got from

 8   them?

 9              THE WITNESS:  Yes.

10              THE COURT:  Any other reports?

11              THE WITNESS:  No.

12              THE COURT:  If you could look at Exhibit F, the first

13   page.

14         Do you see it?

15              THE WITNESS:  Exhibit F, yes.

16              THE COURT:  Do you see the notations in the third

17   column?

18              THE WITNESS:  In the third column, yes.  The third row

19   down.

20              THE COURT:  The one --

21              THE WITNESS:  You mean hours here?

22              THE COURT:  The third column, correct.

23              THE WITNESS:  Yes.

24              THE COURT:  You're right.  I guess it's really -- yes,

25   it's the third column?

1           THE WITNESS:  Right.

2           THE COURT:  Is that your handwriting?

3           THE WITNESS:  No.

4           THE COURT:  Do you know whose handwriting it is?

5           THE WITNESS:  No.  They just handed these to me.

6           THE COURT:  When you had the payroll register, did you

7    ever make notations in the column here?

8           THE WITNESS:  No.

9           THE COURT:  So I want to talk about what the two

10   plaintiffs did during the day.

11          Can you describe what their typical day was for me.

12          THE WITNESS:  They would come at, like 10 o'clock.

13   They would prepare salads or the soy sauce for delivery, which

14   we only have delivery, we didn't have any dining room, and they

15   would prepare -- we had like five guys at this point.

16          THE COURT:  Five?

17          THE WITNESS:  Five guys.

18          THE COURT:  Would they all have similar tasks?

19          THE WITNESS:  Different tasks.

20          THE COURT:  OK.

21          THE WITNESS:  Some of them would make soy sauce.  Some

22   of them would make salad.  Some of them would make fruit salad.

23   Some of them would make I guess utensils, napkins, forks.

24          THE COURT:  When you say make them --

25          THE WITNESS:  We have a bag, and then we put them

Gb3nval2                          Garzon - redirect

1    together, napkins, chopsticks, spoons.

2            THE COURT:  All right.

3            THE WITNESS:  That is what they would do.

4            THE COURT:  Would they do that until the first

5    delivery happened?

6            THE WITNESS:  Yes.  We opened for delivery at 10:45.

7            THE COURT:  What time typically did deliveries -- this

8    is a sushi place?

9            THE WITNESS:  Sushi, yes.

10           THE COURT:  Do people eat sushi at 10"45.

11           THE WITNESS:  Yes.

12           THE COURT:  They do?

13           THE WITNESS:  Yes.

14           THE COURT:  Is there a time when it starts getting --

15           THE WITNESS:  There's a --

16           THE COURT:  Hold on.

17           You can't talk when I'm talking.

18           THE WITNESS:  I'm sorry.

19           THE COURT:  Is there a time when it becomes very busy?

20           THE WITNESS:  From 12 on 1:30.

21           THE COURT:  That's the busiest time?

22           THE WITNESS:  That's the busiest time.

23           THE COURT:  But you have all those people.

24           THE WITNESS:  For lunch.

25           THE COURT:  For lunch?

Gb3nval2                         Garzon - redirect

1                    THE WITNESS:  Lunch.

2                    THE COURT:  What about dinner?

3                    THE WITNESS:  Dinner from 6 to 7:30 or 8.

4                    THE COURT:  But you have the delivery people there for

5         a longer period, is that right?

6                    THE WITNESS:  Right.

7                    THE COURT:  During the times they're not delivering,

8         there's something to do around the restaurant?

9                    THE WITNESS:  Not really, besides the -- they used to

10        wash the utensils for the kitchen.

11                   THE COURT:  Wash the utensils?

12                   THE WITNESS:  Yes.

13                   THE COURT:  Wash the floor also?

14                   THE WITNESS:  Wash the floor, yes.

15                   THE COURT:  What are some of the other things they did

16        when they were waiting for the deliveries?

17                   THE WITNESS:  I guess that's it.

18                   THE COURT:  You said make the soy sauce.

19                   They're putting it into little containers?

20                   THE WITNESS:  Yeah, two-ounce containers.

21                   THE COURT:  How many of those would you use in a day?

22                   THE WITNESS:  Maybe 50.  Busy day 75.

23                   THE COURT:  Were there times when they had nothing to

24        do?

25                   THE WITNESS:  Yes.

1          THE COURT:  Was there a place for them -- what would

2     they do during those times?

3          THE WITNESS:  Sit down.

4          THE COURT:  Is there a place to sit down?

5          THE WITNESS:  Yes, they had chairs.

6          THE COURT:  In the back or --

7          THE WITNESS:  We had the counter, and by that we had

8     like four or five chairs.  We used them for our meal.

9          THE COURT:  It was the same area where the customers

10    walked in?

11         THE WITNESS:  Yes.

12         THE COURT:  Did they receive deliveries from outside

13    sometimes?

14         THE WITNESS:  No.

15         THE COURT:  Who did that?

16         THE WITNESS:  We had the cooks.  And they would help

17    me with the containers.  When the delivery comes from the

18    containers, they would put it away.

19         THE COURT:  Who would put it away.

20         THE WITNESS:  The delivery guys.

21         THE COURT:  What kind of containers are you talking

22    about?

23         THE WITNESS:  For the delivery, the containers that we

24    used for the sushi itself.

25         THE COURT:  So a delivery would come in --

1           THE WITNESS:  Yeah, once a week.

2           THE COURT:  -- of fish?

3           THE WITNESS:  No, not fish.

4           THE COURT:  Of what?

5           THE WITNESS:  Containers, empty containers.

6           THE COURT:  Empty containers.

7           THE WITNESS:  For us to deliver the sushi.

8           THE COURT:  I see.

9           THE WITNESS:  For us to deliver the sushi.

10          THE COURT:  They would help stack the containers?

11          THE WITNESS:  Yes.

12          THE COURT:  How about taking out garbage?

13      Did they do that sometimes?

14          THE WITNESS:  Yes.

15          THE COURT:  One of them did it every day?

16          THE WITNESS:  Yes.

17          THE COURT:  How many times --

18          THE WITNESS:  Not one of them.  Like once we had like

19      five guys, seven guys.  They would share the duties.

20          THE COURT:  So, if you had to estimate how much time

21      Mr. Valle was spending doing these kinds of tasks that didn't

22      involve delivery, the cleaning of the kitchen floor, the

23      preparing of the soy sauce -- by the way, did they buy soda at

24      the market sometimes?

25          THE WITNESS:  Yes.  Two or three six-packs.

1             THE COURT:  Buying soda, stacking the containers,

2    making the ginger sauce, about how much time would you say Mr.

3    Valle sent on average per day doing that?

4             THE WITNESS:  I would say like one hour 15 minutes.

5             THE COURT:  An hour and 15 minutes?

6             THE WITNESS:  Yes.

7             THE COURT:  How about for Mr. Cid?

8             THE WITNESS:  Same thing.

9             THE COURT:  There is a back office?  Where did you do

10   the payroll records?

11            THE WITNESS:  There is a small office in the store.

12            THE COURT:  In the store itself?

13            THE WITNESS:  In the store, yeah.

14            THE COURT:  What time did you arrive at the store?

15            THE WITNESS:  9 a.m.

16            THE COURT:  And what time did you leave.

17            THE WITNESS:  9:30 or 10?

18            THE COURT:  But some people stayed later, is that

19   right?

20            THE WITNESS:  Some people, yes.  I would come early

21   because we would get the vendors' products, fish or meats and

22   vegetables.  That's why I would come early.

23            THE COURT:  So, did Mr. Valle or Mr. Cid have set

24   hours they were supposed to arrive and leave?

25            THE WITNESS:  Yes.

Gb3nval2                          Garzon - redirect

1              THE COURT:  What were they?  Do you remember?

2              THE WITNESS:  The times changed, but most of the time

3     10 o'clock.

4              THE COURT:  They were supposed to arrive at 10?

5              THE WITNESS:  Yes.

6              THE COURT:  They clocked in.

7              Did they have a midday break or not?

8              THE WITNESS:  Right.

9              THE COURT:  Tell me what their hours were.

10             THE WITNESS:  From 10 to 2 some of them.

11             THE COURT:  I want to ask about these two.  If you

12    don't remember, tell me.

13             THE WITNESS:  I don't remember exactly.

14             THE COURT:  So, let me ask you, were there shifts that

15    were assigned to different people, regular shifts?

16             THE WITNESS:  Yes.

17             THE COURT:  Tell me what some of those shifts were.

18             THE WITNESS:  One of them was from 10 to 2.

19             THE COURT:  Yes.

20             THE WITNESS:  And from 4 to 8 or -- yeah, from 4 to 8,

21    I would say.  And then the others were from 11 to 3 and then

22    from 5 to 9.

23             THE COURT:  Were there other shifts?

24             THE WITNESS:  No.

25             THE COURT:  That was the only possibility?

Gb3nval2                    Garzon - redirect

1              THE WITNESS:  Yes.

2              THE COURT:  10 to 2 and 4 to 8?

3              THE WITNESS:  Yes.

4              THE COURT:  And from 11 to 3 and 5 to 9.

5              THE WITNESS:  Yes.

6              THE COURT:  When you left were there sometimes

7      delivery people there.

8              THE WITNESS:  No.

9              THE COURT:  I would leave around 9, 9:30.

10             THE COURT:  What time did the place close?

11             THE WITNESS:  9.

12             THE COURT:  The store closed at 9 for the entire

13     period?

14             THE WITNESS:  No.  There was times when it closed

15     later, like before.

16             THE COURT:  Tell me.  Tell me exactly.

17             THE WITNESS:  I would say like 2010 we used to close

18     at 10:30.  Eventually we started closing 9:30 and then 9, and

19     then finally we started closing at 7 p.m.

20             THE COURT:  Well, let's talk about 2008.

21             Do you remember when you closed then?

22             THE WITNESS:  2008 we used to close at 11.

23             THE COURT:  And 2009.

24             THE WITNESS:  2009 maybe 11, too.

25             THE COURT:  2010?

1          THE WITNESS:  We started closing at 9:30.

2          THE COURT:  9:30?

3          THE WITNESS:  Yes.

4          THE COURT:  2011?

5          THE WITNESS:  Like 9.

6          THE COURT:  2012?

7          THE WITNESS:  9.

8          THE COURT:  OK.  So during the two years when you were

9     closing at 11, there would be a period of a couple of hours

10    after you left, is that right?

11         THE WITNESS:  That time I would stay until close.  I

12    mean, right now I'm leaving at 9, but at that time I was always

13    at the closing.

14         THE COURT:  You would stay until closing?

15         THE WITNESS:  Yes.

16         THE COURT:  Let me ask you about shifts in 2008 and

17    2009.  What were the shifts in those years?

18         Were there regular shifts that people had?

19         THE WITNESS:  I would say like 10 --

20         THE COURT:  Tell me if you remember.

21         THE WITNESS:  10 to 2 or to 3.

22         THE COURT:  10 to 2 or 3 and then what?

23         THE WITNESS:  And then, if it's 3, then from 5 to 9 --

24         THE COURT:  Any other shifts?

25         THE WITNESS:  -- or 10.

1               THE COURT:  Any other shifts?

2               THE WITNESS:  No, that's it.

3               THE COURT:  10 to 2 or 3, and then from 5 to 9 or 10?

4               THE WITNESS:  Right.

5               THE COURT:  But if you were open until 11 p.m. --

6               THE WITNESS:  There would be other guys who would come

7       later.

8               THE COURT:  I am asking you all the shifts.

9               THE WITNESS:  Other guys who come at 11 and then leave

10      around 10.  Other guys would only work for dinner.  They would

11      come at 5 and they would leave at 11.

12              THE COURT:  Did everyone have a two-hour break or

13      more?

14              THE WITNESS:  The guys who were working for lunch,

15      yes, at that time.

16              THE COURT:  Give me a break for about one minute.

17              (Recess)

18              THE COURT:  I don't have anything further.

19              Since I asked a number of questions, certainly I will

20      give you a folks a chance to clear anything up if you want.

21              Mr. Clark?

22              MR. CLARK:  Nothing, your Honor.

23              THE COURT:  Mr. Ferst, anything?

24              MR. FERST:  No.  Thank you, your Honor.

25              THE COURT:  Mr. Clark, anything?

1          MR. CLARK:  Nothing for the plaintiffs.

2          THE COURT:  Thank you.

3          You can step down.

4          THE WITNESS:  Thank you.

5          (Witness left the stand)

6          THE COURT:  Mr. Ferst, other witnesses?

7          MR. FERST:  The defendants call Allan Wartski.

8   ALLAN WARTSKY,

9        called as a witness by the Defendants,

10       having been duly sworn, testified as follows:

11  BY MR. FERST:

12          THE COURT:  You can proceed, Mr. Ferst.

13          MR. FERST:  Thank you, your Honor.

14  DIRECT EXAMINATION

15  BY MR. FERST:

16  Q.  Mr. Wartski, are you the president of Gordon Chen's Kitchen

17  LLC.

18  A.  I am member of the LLC.

19  Q.  Are you the manager of the LLC?

20  A.  I am the managing member of the LLC.

21  Q.  Are you familiar with Mac-War Rest Corp. or Mac-War

22  Restaurant Corp.?

23  A.  Yes, I am.

24  Q.  Were you the president of that corporation?

25  A.  Yes, I was.

Gb3nval2                    Wartski - direct

1    Q.  For how long have you been doing through these entities

2    business as Hakata?

3    A.  Over 30 years.

4    Q.  In managing the business or in running the business, have

5    you consulted with professionals concerning your obligations

6    concerning payroll?

7    A.  Yes, I have.

8    Q.  What information were you looking for?

9    A.  Pay rate changes, and -- the basically pay rate changes.

10   Q.  Are you familiar with tip rate?

11   A.  Yes, I am.

12   Q.  Are you familiar with non-tip rate?

13   A.  Yes, I am.

14   Q.  Did there come a time when you caused the various entities

15   doing business as Hakata to retain the services of a payroll

16   company?

17   A.  Yes.

18   Q.  Did you give instructions concerning the integrity of

19   recordkeeping?

20   A.  Yes.

21   Q.  What were those instructions?

22   A.  To do everything according to how we are supposed to.

23   Everybody had to punch in.  In the days before automation with

24   the POS, everybody had to punch in and punch out.  It was done

25   on the time clock.

1          MR. FERST:  May I hand the witness the exhibits?

2          THE COURT:  Yes.

3   BY MR. FERST:

4   Q.  Have you heard the testimony about how those records were

5   created?

6   A.  Yes, I have.

7   Q.  Is it accurate?

8   A.  Yes.

9          MR. CLARK:  Objection.

10          THE COURT:  I don't think it adds anything.  So just

11   go ahead.

12   BY MR. FERST:

13   Q.  Have you ever told Mr. Garzon to lie?

14   A.  No, sir.

15   Q.  Have you ever told Mr. Garzon to put in improper records?

16   A.  No, sir.

17   Q.  What did you tell Mr. Garzon vis-a-vis recordkeeping?

18   A.  Vis-a-vis recordkeeping, to keep a time clock, record it on

19   the sheet, and get it over to the payroll company.

20   Q.  To your satisfaction was that done.

21   A.  Yes, it was.

22   Q.  Were you in constant contact with Mr. Garzon concerning

23   that?

24   A.  And other things, of course.

25   Q.  Did you review the checks when they came in?

Gb3nval2                        Wartski - direct

1   A.  Sometimes no.

2   Q.  Sometimes yes?

3   A.  Very few times.  More no than yes.

4   Q.  Very good.  Now, were you satisfied that your instructions

5   were being followed?

6   A.  Yes.

7   Q.  Did you ever ask Mr. Garzon to fabricate a pattern of

8   recordkeeping?

9   A.  Absolutely not.

10  Q.  Did you hear his testimony about how the records were

11  created?

12  A.  Yes.  I am not sure I understand your question fully, but

13  how the payroll records were created?

14  Q.  Yes.

15  A.  From a schedule --

16          THE COURT:  He asked if you heard the testimony.

17          That is all he asked.

18          Did you hear Mr. Garzon's testimony?

19          THE WITNESS:  Yes, I did.

20          THE COURT:  Next question.

21          MR. FERST:  Thank you.

22  BY MR. FERST:

23  Q.  Did Mr. Garzon accurately describe it to your satisfaction?

24          MR. CLARK:  Objection.

25  A.  Yes.

1              THE COURT:  That's sustained.

2              I think we have to now get, if you want to find out

3    what he knows or didn't know, you are free to do that, but not

4    by reference to an entire block of narrative testimony.

5    BY MR. FERST:

6    Q.  To your satisfaction are those accurate records that you

7    have next to you?

8    A.  Absolutely.

9    Q.  And you are sure that you never asked anyone to come and

10   lie here?

11   A.  Absolutely.  100 percent.

12   Q.  Did you hear plaintiff's counsel ask whether or not you

13   could fire Mr. Garzon?

14   A.  Of course I could.

15   Q.  Did you tell him to come here and lie or --

16   A.  Absolutely not.

17   Q.  -- else I'm going to fire you?

18              MR. FERST:  I have no further questions.

19              MR. CLARK:  Very brief, your Honor.

20   CROSS EXAMINATION

21   BY MR. CLARK:

22   Q.  You would have power to fire Mr. Garzon, correct?

23   A.  Yes.

24   Q.  Indeed, you would be able to fire any employee at Hakata

25   Grill, correct?

 1  A.  Yes.

 2  Q.  You have control over that restaurant, correct?

 3  A.  Yes.

 4  Q.  If you wanted to make any change whatsoever in the business

 5  dealings of --

 6  A.  Yes.

 7  Q.  -- Hakata Grill, you would have that power?

 8  A.  Yes.

 9            MR. CLARK:  No further questions, your Honor.

10            MR. FERST:  No further questions, your Honor.

11            THE COURT:  Nothing from me.

12            You can step down, sir.  Thank you.

13            (Witness left the stand)

14            THE COURT:  Mr. Ferst, what's next for the defense?

15            MR. FERST:  The defense rests.

16            THE COURT:  OK.

17            Mr. Clark, anything further?

18            MR. CLARK:  No, your Honor.

19            Certainly, as we referenced earlier, we would like the

20  opportunity to present posttrial briefing.

21            THE COURT:  OK.  It seems like one big issue is going

22  to be the tip credit.  I actually haven't had that issue come

23  up in a case where I had to adjudicate it.

24            I assume the plaintiffs' position is if they don't get

25  the notice, that's it.  They have to be paid the full rate.

1          Is that right?

2              MR. CLARK:  Yes, your Honor.

3              Our position is, is that without proper notice,

4   specifically written notice is required under the New York

5   Labor Law, the calculation of damages is the difference between

6   the tip, whatever was paid, and the proper minimum wage and

7   overtime rate.

8              THE COURT:  What is your position about this?

9              MR. FERST:  That the check stubs are notice.

10             THE COURT:  That the check stubs constituted the

11  notice?

12             MR. FERST:  Absolutely.

13             THE COURT:  All right.

14             So someone will brief all that for me.

15             MR. FERST:  We certainly intend to, your Honor.

16             THE COURT:  OK.  How do you want to do this?

17             Do you want to do simultaneous submissions and then

18  simultaneous replies?  I think that makes sense.

19             MR. FERST:  I would prefer that, your Honor.

20             MR. CLARK:  I'm fine with simultaneous as well, your

21  Honor.

22             THE COURT:  Do you have an idea for when you want to

23  do this.  Remember you have to get a transcript, and then you

24  have to prepare this, and every factual statement in your brief

25  needs to have a transcript cite next to it whether it's in a

1  fact section or an argument section.

2         MR. CLARK:  Understood, your Honor.  We spoke, and I

3  think 60 days should be adequate.

4         MR. FERST:  Maybe that should be 60 days from receipt

5  of the transcript because we don't know with all due respect to

6  our stenographer how backlogged they may be.

7         THE COURT:  Whatever you want to pay.  I think there

8  is a three-week rate.

9         MR. CLARK:  Three weeks, your Honor.

10        MR. FERST:  Three weeks is fine.

11        THE COURT:  Let's assume three weeks, and then you

12  want to add 60 days to that.

13        MR. CLARK:  That works for the plaintiffs, your Honor.

14        MR. FERST:  If it works for the plaintiff, it works

15  for us.

16        THE COURT:  Let's say January 27.

17        How much time for responses?  Two weeks?  Three weeks?

18        MR. CLARK:  Two weeks is fine with me.

19        THE COURT:  Two?

20        MR. FERST:  Make it three just in case, if the Court

21  will so permit.

22        THE COURT:  That's fine.  February 17.  In case that

23  is a holiday, we'll do it the following Monday.

24        MR. FERST:  Very good.

25        MR. CLARK:  Thank you, your Honor.

Gb3nval2                          Wartski – cross

1          THE COURT:  Anything else we should be doing today?

2          MR. CLARK:  Nothing from the plaintiffs, your Honor.

3          MR. FERST:  Nothing from the defendants.

4          THE COURT:  Thank you, everyone.

5          MR. FERST:  Thank you.

6          MR. CLARK:  Thank you, your Honor.

7          (Trial concluded)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Gb3nval2                        Wartski — cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

EDGAR CID GONZALEZ

Direct By Mr. Clark  . . . . . . . . . . . . . 6

Cross By Mr. Ferst . . . . . . . . . . . . . .27

ALEJANDRO VALLE HERRERA

Direct By Mr. Clark  . . . . . . . . . . . . .36

Cross By Mr. Ferst . . . . . . . . . . . . . .49

PEDRO GARZON

Direct By Mr. Ferst  . . . . . . . . . . . . .60

Cross By Mr. Clark . . . . . . . . . . . . . .87

Redirect By Mr. Ferst  . . . . . . . . . . . .91

ALLAN WARTSKY

Direct By Mr. Ferst  . . . . . . . . . . . . 111

Cross By Mr. Clark . . . . . . . . . . . . . 115

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 A, B, C, D, E, F, G and H   . . . . . . . . .54