UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ALEJANDRO VALLE et al.,                          :

                    Plaintiffs,                  :
                                                              OPINION AND ORDER
                                                 :            15 Civ. 2005 (GWG)
                    -v-
                                                 :

GORDON CHEN'S KITCHEN LLC et al.,                :

                    Defendants.                  :
------------------------------------------------------------------x
GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

        Plaintiffs Alejandro Valle and Edgar Cid[1] brought this action against Gordon Chen's

Kitchen, LLC, Mac-War Restaurant Corporation, and Allan Wartski (collectively, "defendants")

to recover unpaid wages and other damages arising out of defendants' alleged violations of the

Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA"), and the New York Labor Law,

N.Y. Labor Law § 1 et seq. ("NYLL").  The Court held a bench trial on November 3, 2016, and

has considered the parties' submissions.[2]  This Opinion and Order contains the findings of fact

and conclusions of law required by Federal Rule of Civil Procedure 52(a)(1).

I. <u>BACKGROUND</u>

        In brief, plaintiffs contend that they worked for defendants' restaurant as delivery

--------------------------------------------------

        [1] Edgar Cid was also known as Balverde Lopez or "Daniel" Lopez.  (Garzon: Tr. 62, 77).

        [2] <u>See</u> Defendants' Proposed Findings of Fact and Conclusions of Law, filed Aug. 22,
2016 (Docket # 41) ("Defs. Pre-trial Mem."); Plaintiffs' Proposed Findings of Fact and
Conclusions of Law, filed Aug. 22, 2016 (Docket # 42) ("Pls. Pre-trial Mem."); Joint Pretrial
Order, filed Aug. 26, 2016 (Docket # 44); Post-Trial Memorandum of Defendants Gordon
Chen's Kitchen LLC (d/b/a/ Hakata Grill), Mac-War Rest. Corp. (d/b/a/ Hakata Grill), and Allan
Wartski, filed Jan. 27, 2017 (Docket # 49) ("Defs. Mem."); Plaintiffs' Post-Trial Memorandum
of Law, filed Jan. 27, 2017 (Docket # 50); Opposition to Plaintiffs' Post-Trial Memorandum of
Law, filed Feb. 17, 2017 (Docket # 53) ("Defs. Reply").

workers and were not properly paid under federal and state labor laws. They contend that defendants improperly used a "tip credit" to calculate plaintiffs' hourly wage instead of paying them at minimum wage; that the hourly overtime rate paid by defendants was too low; that plaintiffs worked more hours than were reflected on defendants' records; that defendants failed to provide plaintiffs with the notices required by the NYLL; and that defendants failed to pay them "spread of hours" pay as required by the NYLL. Pls. Pre-trial Mem. at 7-12, 15.

The Court has subject matter jurisdiction over plaintiffs' federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction over their state law claims under 28 U.S.C. § 1367(a).

## II. FACTS

### A. Undisputed Facts

Gordon Chen's Kitchen LLC operates and controls a Japanese restaurant called "Hakata Grill" at 232 East 53rd Street in New York, New York. (Cid: Tr. 8; Garzon: Tr. 60).[3] Mac-War Restaurant Corporation previously did business as Hakata Grill at 230 West 48th Street in New York, but ceased operations on December 14, 2008. (Cid: Tr. 29; Garzon: Tr. 60-61). Allan Wartski is the managing member of Gordon Chen's Kitchen LLC, was the president of Mac-War Restaurant Corporation, and has been doing business through these entities as "Hakata" for over 30 years. (Wartski: Tr. 111-112). Hakata hired Cid in September 2008, and Valle in October 2010, to make deliveries of food orders. (Cid: Tr. 8; Valle: Tr. 37-38). Cid worked under the name "Balverde 'Daniel' Lopez." (Cid: Tr. 33; Garzon: Tr. 77). Both plaintiffs stopped working at Hakata in 2014. (Cid: Tr. 8; Valle: Tr. 37).

---

[3] "Tr." refers to the transcript of the trial which has been filed as Docket # 51.

B. Trial Testimony

    1. Edgar Cid

Cid testified that before October 2011 he worked Monday to Saturday, 10:30 a.m. to 4:00 p.m. and 6:00 p.m. to 10:30 p.m. (Cid: Tr. 9-10). He said that he began working only five days a week after October 2011, when the restaurant began closing on Saturdays. (Cid: Tr. 11-13).[4] Cid testified that, when he started working at Hakata, he did not have to record when he came to work and when he left. (Cid: Tr. 14). That changed in 2012, at which point he had to punch numbers into a computer system to enter and to leave. (Cid: Tr. 14-15). Cid said that this was "just for a month." (Cid: Tr. 14).

Cid testified that he was told he was paid $4.65 per hour when he first started at Hakata. (Cid: Tr. 15-16). He was not paid any supplementary pay if he worked more than 40 hours in a week. (Cid: Tr. 16). His pay increased to $5 per hour beginning in October 2010, then to $5.65 "approximately from 2012 to 2014." (Id.). He received tips, but was never told how those tips would affect his compensation from the restaurant. (Cid: Tr. 17).

Cid testified that he was paid by check each week, which came with a slip of paper that Cid "never paid very much attention to." (Cid: Tr. 29-30). The slip of paper could have included his number of hours worked, his hourly rate, and notations of tips and what was withheld from wages. (Cid: Tr. 31). He said that the check covered 40 hours of work, but he was regularly paid in cash for an extra 10 hours of work per week not listed on these slips of paper. (Cid: Tr. 33-34). He testified that the extra time was paid "in a different check written,

---

[4] Cid's testimony about when this change occurred was inconsistent. He first testified that this change occurred in October 2010. (Cid: Tr. 9). He then testified that the restaurant closed on Saturdays "[i]n March of 2009 . . . [t]hrough October of 2010." (Cid: Tr. 10). Later, he testified that the change occurred in October 2011. (Cid: Tr. 13-14).

payable to a different person, and then that person would cash the check and pay [him] cash, but at the regular hours." (Cid: Tr. 33). He said that he was paid either in cash or by check at the regular hourly rate for all 50 hours. (Cid: Tr. 33-34).

Cid testified that he made approximately 22 deliveries per day. (Cid: Tr. 20). When he was not making deliveries, he performed other activities, such as purchasing and organizing food items, cleaning, and preparing soy sauce and ginger dressing. (Cid: Tr. 17-18). He spent a half-hour preparing soy sauce every day, washed utensils for half an hour per day, cleaned the floor for half an hour per day, prepared ginger sauce two times a week for a half-hour, and stocked soda for 15 minutes once per week. (Cid: Tr. 18-19).

### 2. Alejandro Valle

Valle testified that his starting schedule was from 10:30 a.m. to 2:00 p.m., then 4:00 p.m. to 10:30 p.m., five days per week. (Valle: Tr. 38-39). His schedule changed in 2012, when he started working from 9:30 a.m. to 2:00 p.m. and from 4:00 p.m. to 10:30 p.m. (Valle: Tr. 39). At first, he did not have to record the time he came to work in the morning and left in the evening. (Valle: Tr. 38-39). "[F]or two months" in 2012, however, he had to put his arrival and departure times into a computer system. (Valle: Tr. 40).

Valle was told he would be paid $4.65 per hour when he first started, which was paid by check. (Valle: Tr. 40-41). He received checks for 40 hours of work, both delivery and non-delivery. (Valle: Tr. 50-51). He also received additional money that was "changed" for him by a coworker. (Id.). He did not remember if anything was attached to the check. (Valle: Tr. 52). His pay increased to $5 per hour in January 2011, then to $5.65 per hour in October 2012. (Valle: Tr. 41-42). He also received tips, but was never told how receiving those tips would affect his wages. (Valle: Tr. 42).

4

Valle made between 18 and 25 deliveries each day. (Valle: Tr. 46-47). When he was not making deliveries, he prepared salad every day for 30-40 minutes, cleaned the floor for about 45 minutes, prepared delivery bags for about 20 minutes, put deliveries from suppliers away about twice a week for about 20 minutes, and twice a week washed dishes for 30 minutes or more. (Valle: Tr. 44-45). Additionally, in 2014, Valle bought soda twice a week for a half-hour, made ginger dressing twice a week for a half-hour, and made soy sauce every day for 20-25 minutes. (Valle: Tr. 46).

### 3. Pedro Garzon

Garzon testified that he is a manager at Gordon Chen's Kitchen, and had worked there and at Mac-War Restaurant for 22 years, becoming the manager in 2004. (Garzon: Tr. 60-61). His most "important" job is to keep the records and hours for the restaurant's employees, including recording the time they come in and the time they leave work. (Garzon: Tr. 61-62). He remembered Valle and Cid (whom he knew as Daniel Lopez) from when they worked there, and he gave them their work assignments beginning in January 2010. (Garzon: Tr. 62-64). He was on the premises at all times when plaintiffs were there, and neither one was there for more than 10 hours a day. (Garzon: Tr. 64-65, 67). Also, plaintiffs would normally leave in the middle of the day, then return. (Garzon: Tr. 93-94).

Garzon described the method by which Hakata kept track of work hours from 2008 to 2014. Originally there was only a time clock that required a "punch in" and "punch out" using a card. (Garzon: Tr. 92). Garzon was responsible for maintaining the system, which indicated the date and time, with places on the punch cards for four time entries per day, five days per week. (Garzon: Tr. 92-94). Garzon would take these cards and record the hours listed, rounding up to the nearest 15-minute increment, to calculate the number of hours each employee worked.

5

(Garzon: Tr. 94-98).  The total hours for each employee was then transferred to the payroll department.  (Garzon: Tr. 98-99).  The restaurant switched from this system to a computerized POS system he set up in 2013.  (Garzon: Tr. 62, 66).  He testified that every time there was overtime he would memorialize it and put it into the payment system.  (Garzon: Tr. 84-86).  This overtime would be paid at "time and a half."  (Garzon: Tr. 81).  The time cards were kept for about four years but were lost during a move.  (Garzon: Tr. 99).

Garzon testified that the delivery workers were always paid their weekly wages by check. (Garzon: Tr. 67, 73).  The checks were attached to a "stub" that would show the number of hours worked and the tips each employee had been paid.  (Garzon: Tr. 76).  Garzon would also distribute tips to the delivery workers daily, in cash, after pooling the tips from every delivery worker.  (Garzon: Tr. 67-68).  The delivery workers would keep cash tips customers gave them — apparently without being recorded in their wage statements.  (See Garzon: Tr. 69).  Most of the tips were on credit cards, however.  (Id.).  Garzon would run a report each day that would tell him credit card tips from the previous day, then divide that total by the number of delivery workers who worked and pay each one their share in cash.  (Garzon: Tr. 67-68, 71-72).  Garzon would receive a check from Wartski each week, made out to "cash," which he would redeem and use to distribute tips on a daily basis.  (See id.).

The tips paid in this manner were reflected on the pay stubs.  (Garzon: Tr. 73).  Garzon admitted that he does not know what a "tip credit" is, and that he did not provide the delivery workers with a written notice about what it means to take a tip credit.  (Garzon: Tr. 89).

Garzon testified that, in addition to delivering food, delivery workers would also make soy sauce, make salad, make fruit salad, prepare delivery bags with utensils, napkins, and chopsticks, wash utensils, wash the floor, help put away delivery containers, buy soda, take out

garbage, and make ginger sauce. (Garzon: Tr. 101-05). He estimated that Cid and Valle spent an average of one hour and 15 minutes per day doing these tasks. (Garzon: Tr. 106).

4. <u>Allan Wartski</u>

Wartski testified that he consulted with "professionals" concerning his payroll obligations, attempting to learn when pay rates changed, and that he was familiar with "tip rate" and "non-tip rate." (Wartski: Tr. 112). He claimed, concerning "the integrity of recordkeeping," that he gave instructions "[t]o do everything according to how we are supposed to," meaning that all employees had to "punch in" and "punch out" each day. (Wartski: Tr. 112).

Wartski said that he has never told Garzon to lie or "put in improper records," and instructed him to "keep a time clock, record it on the sheet, and get it over to the payroll company," all of which was done to his satisfaction. (Wartski: Tr. 113). He very rarely reviewed the paychecks Garzon issued to the delivery workers. (Wartski: Tr. 113-14). On cross-examination, Wartski testified that he could fire Garzon, or make any other change he wanted to the business dealings of Hakata. (Wartski: Tr. 115-16).

C. <u>Pay Statements and Payroll Registers</u>

Plaintiffs entered into evidence defendants' trial exhibits A through H (Tr. 53-54), which were copies of weekly pay statements issued to "Lopez" (a.k.a Cid) from 2009 to 2011, weekly pay statements issued to Valle from 2010 to 2011, and weekly payroll registers maintained by defendants referencing payments to Valle and Lopez from 2012 to 2014, Exs. A-H. The pay statements generally show the number of hours plaintiffs worked, their hourly rates, the tips they reportedly received, the number of any overtime hours worked, and an hourly overtime rate one and one-half times their base rate. <u>See</u> Exs. A-E. The payroll registers contain the same information. <u>See</u> Exs. F-H.

These records indicate that plaintiffs were paid at a rate of $4.60 per hour from 2009 to May 2010, $4.65 per hour from May 2010 to January 2011, $5 per hour from January 2011 to December 2011, and $5.65 per hour for the remainder of their employment.[5] See, e.g., Balverde Lopez Pay Stub, dated Jan. 2, 2009, Ex. A ($4.60 per hour); Balverde Lopez Pay Stub, dated May 28, 2010, Ex. B (same); Balverde Lopez Pay Stub, dated June 4, 2010, Ex. B ($4.65 per hour); Alejandro Valle Pay Stub, dated Dec. 31, 2010, Ex. D (same); Alejandro Valle Pay Stub, dated Jan. 6, 2011, Ex. E ($5 per hour); Alejandro Valle Pay Stub, dated Dec. 30, 2011, Ex. E (same); Payroll Registers, Exs. F-H ($5.65 per hour). Where overtime was paid, the hourly rates were $6.98 in 2010, $7.50 in 2011, either $8.48 or $9.28 in 2012, $9.28 in 2013, and $9.65 in 2014. See generally Exs. B-H.

D. Findings on Disputed Issues of Fact

We accept the testimony of Garzon as credible. Although plaintiffs attempted at trial to impeach Garzon by implying Wartski influenced his testimony (see Garzon: Tr. 90-91), Garzon credibly testified that Wartski never told him to lie, alter records, or otherwise deceive the court (Garzon: Tr. 91-92). Wartski similarly credibly testified that he never told Garzon to lie or to create improper records. (Wartski: Tr. 113-15). Regarding defendants' method of record-keeping before they began to use a computerized system, Garzon testified clearly and consistently, and when examined by the Court about the system's operation, he answered questions without hesitation or equivocation. (See Garzon: Tr. 92-101). Additionally, the payroll records before 2013 do not reflect a uniform number of hours worked, but instead varied

_____

[5] Some payroll records also include time noted for Valle and "Lopez" as "cooks" paid at $11 per hour, see, e.g., Payroll Register, dated Feb. 14, 2014, Ex. H, which Garzon testified was for when plaintiffs helped with catering events (see Garzon: Tr. 81, 87).

and sometimes included overtime, supporting Garzon's testimony that they were entered manually each week from the time cards.  Compare Balverde Lopez Pay Stub, dated Jan. 1, 2010, Ex. B (31 hours worked), with Belvedere Lopez Pay Stub, dated Apr. 9, 2010, Ex. B (40 hours), Belvedere Lopez Pay Stub, dated Jan. 21, 2011, Ex. C (44 hours), and Payroll Register, dated Apr. 13, 2012, Ex. F (42.5 hours).  We also credit Garzon's testimony that from 2010 through 2012 the restaurant closed at 9:30 p.m. or earlier, and that the delivery shifts ran from 10:00 a.m. to 2:00 or 3:00 p.m., then from 5:00 p.m. to 9:00 or 10:00 p.m.  (Garzon: Tr. 108-10).  As a result, we conclude that the payroll records (exhibits A through H) are accurate as to the number of hours that plaintiffs worked.  These records reflect the total number of hours plaintiffs worked each week, including their overtime hours, and their rate of pay.

We thus reject the testimony of Cid and Valle regarding the hours they worked to the extent it was inconsistent with Garzon's testimony and the pay records.  Neither plaintiff explained why their pay stubs varied in hours, or why they received overtime for some days but not for others, despite claiming that there was no requirement to record the hours they came and went.

We recognize that Cid testified that his overtime pay was paid "in a different check written, payable to a different person, and then that person would cash the check and pay us in cash, but at the regular hours."  (Cid: Tr. 33).  But this was more or less congruent with the system that Garzon used to pay delivery workers their tips — that is, that Wartski would make a check out for the total amount of tips from credit card receipts and that this check would then be cashed.  (Garzon: Tr. 67-72).  It is also consistent with the pay records, which indicate separate sums attributable to tips.

As for the number of non-tipped hours worked, Cid said that he spent a half-hour every

9

day preparing soy sauce, a half-hour every day washing utensils, and a half hour every day cleaning the kitchen floor. (Cid: Tr. 17-19). He also spent a half-hour preparing ginger sauce twice a week, and 15 minutes stocking soda once per week. (Id.). Valle said that he spent 30-40 minutes preparing salad and fruit salad every day, 45 minutes cleaning the floor every day, and 20 minutes preparing delivery bags every day. (Valle: Tr. 44-45). Additionally, he testified he spent 20 minutes once or twice a week putting away deliveries from suppliers, and in 2014 he bought soda twice a week for half an hour; made ginger dressing twice a week for a half-hour; and made soy sauce every day for 20-25 minutes. (Valle: Tr. 45-46). While we accept that plaintiffs performed these tasks, we believe that their testimony in general was not as clear and consistent as that of Garzon. Garzon acknowledged that plaintiffs performed all of these non-delivery tasks. (Garzon: Tr. 103-05). But he estimated that plaintiffs spent about an hour and 15 minutes per day completing them. (Garzon: Tr. 106). Based on this testimony and the description of the tasks involved, the Court estimates that plaintiffs spent one and one-half hours per eight-hour shift performing non-delivery work.

III. DISCUSSION

    A. Minimum Wage Claims

The FLSA provides that every employer not otherwise exempt from its coverage must pay any employee engaged in commerce a minimum hourly wage. See 29 U.S.C. § 206(a)(1).[6]

---

[6] The FLSA applies to enterprises "whose annual gross volume of sales made or business done is not less than $500,000." 29 U.S.C. § 203(s)(1)(A)(ii). The failure to prove this element does not implicate subject matter jurisdiction. See, e.g., Rocha v. Bakhter Afghan Halal Kababs, Inc., 44 F. Supp. 3d 337, 344 (E.D.N.Y. 2014) (collecting cases); Padilla v. Manlapaz, 643 F. Supp. 2d 298, 300-01 (E.D.N.Y. 2009) (discussing Arbaugh v. Y & H Corp., 546 U.S. 500 (2006) which found that coverage under the statute in the Title VII context is not a jurisdictional issue). Although defendants did not concede at trial that their revenue is greater than $500,000 a year (Tr. 22), they make no argument in their pre- or post-trial memoranda of law that the FLSA

While plaintiffs worked for Hakata, the applicable federal minimum wage was between $5.85 per hour and $7.25 per hour. See 29 U.S.C. § 206(a)(1) (listing federal minimum wage rates). The New York State minimum wage rate as of July 12, 2013, was $7.15 per hour. NYLL § 652. It increased to $8 on December 31, 2013, and to $8.75 on December 31, 2014. Id. The rates at which plaintiffs were paid while working at Hakata were consistently less than both the federal and state minimum wages. See generally Exs. A-H (showing plaintiffs' hourly rate as $4.60, $4.65, $5, and $5.65).

Under certain conditions, an employer is entitled to pay an employee an hourly wage less than the standard minimum wage if the employee receives tips from customers for his or her services. See 29 U.S.C. §§ 203(m), (t). However, under the FLSA,

> an employer may not claim a tip credit as to an employee's wages unless the employer has informed that employee of the provisions of the section of the FLSA permitting the tip credit. 29 U.S.C. § 203(m); see, e.g., Copantitla v. Fiskardo Estiatorio, Inc., 788 F. Supp. 2d 253, 287 (S.D.N.Y. 2011); Chung v. New Silver Palace Rest., Inc., 246 F. Supp. 2d 220, 228-29 (S.D.N.Y. 2002). "This notice provision is strictly construed and normally requires that an employer take affirmative steps to inform affected employees of the employer's intent to claim the tip credit." Perez v. Lorraine Enters., Inc., 769 F.3d 23, 27 (1st Cir. 2014); see, e.g., Kilgore v. Outback Steakhouse of Fla., Inc., 160 F.3d 294, 298 (6th Cir. 1998); Reich v. Chez Robert, Inc., 28 F.3d 401, 404 (3d Cir. 1994); Hart v. Rick's Cabaret Int'l, Inc., 967 F. Supp. 2d 901, 934 (S.D.N.Y. 2013); Lanzetta v. Florio's Enters., Inc., 763 F. Supp. 2d 615, 623 (S.D.N.Y. 2011).

Inclan v. N.Y. Hosp. Grp., Inc., 95 F. Supp. 3d 490, 497 (S.D.N.Y. 2015). An employer

---

does not apply to them. Additionally, Cid and Valle's testimony makes it more likely than not that defendants' gross revenue was greater than $500,000. Cid testified that he made about 22 deliveries per day, with an average value of around $25 per delivery. (Cid: Tr. 20, 23). Valle testified that he made about 22 deliveries per day, with an average value of around $30 per delivery. (Valle: Tr. 47, 49). Conservatively estimating 22 deliveries per day, five days per week, at $25 per delivery, plaintiffs alone would have delivered around $143,000 worth of merchandise each per year. With about four deliverymen at the restaurant (e.g. Cid: Tr. 21), defendants easily made over $500,000 in gross revenue per year.

"bear[s] the burden of showing that they have satisfied [the FLSA's notice] requirement by, for example, providing employees with a copy of § 203(m) and informing them that their tips will be used as a credit against the minimum wage as permitted by law." Chan v. Sung Yue Tung Corp., 2007 WL 313483, at *18 (S.D.N.Y. Feb. 1, 2007); accord He v. Home on 8th Corp., 2014 WL 3974670, at *5 (S.D.N.Y. Aug. 13, 2014); Copantitla, 788 F. Supp. 2d at 288. An employer who fails to provide the required notice is liable under the FLSA for unpaid minimum wages. See, e.g., Reich, 28 F.3d at 403 ("If the employer cannot show that it has informed employees that tips are being credited against their wages, then no tip credit can be taken and the employer is liable for the full minimum-wage . . . ."); Inclan, 95 F. Supp. 3d at 498 (as defendants did not meet burden of proving they provided notice of tip credit, they were liable under the FLSA for unpaid minimum wages without a tip credit allowance).

New York law also requires that an employer provide an employee notice before it may deduct a "tip credit" from the employee's base wage. N.Y. Comp Codes R & Regs. tit. 12, § 146-2.2 (effective Jan. 1, 2011); id. § 137-2.2 (repealed effective Jan. 1, 2011); accord Inclan, 95 F. Supp. 3d at 498. The burden is on the defendants to show that they have complied with the tip notice requirement. See N.Y. Comp Codes R & Regs. tit. 12, § 146-2.2(d) ("The employer has the burden of proving compliance with the notification provisions of [the NYLL]."); Villar v. Prana Hosp., Inc., 2017 WL 1333582, at *3 n.4 (S.D.N.Y. Apr. 11, 2017).

Here, defendants have offered no argument that they complied with the FLSA or the NYLL's requirement that notice be given before the tip credit is taken. Notably Garzon testified that he does not know what a "tip credit" is. (Garzon: Tr. 89). Both plaintiffs testified that they were never told how receiving tips would affect their wages. (Garzon: Tr. 17; Valle: Tr. 42).

Rather, the only argument defendants have offered on the tip credit issue is that the claim

is not properly pled in the complaint and thus was not properly raised at trial. See Defs. Reply at 1-3. While the complaint is not a model of clarity, plaintiffs clearly alleged that they were not paid minimum wage, Complaint, filed Mar. 17, 2015 (Docket # 1) ("Compl.") ¶¶ 81, 103-109, 114-118; pled that "[a]t no time did Defendants inform Plaintiffs that they had reduced their hourly wage by a tip allowance," id. ¶ 88; and sought "damages for the amount of unpaid minimum and overtime wages, and damages for any improper deductions or credits taken against wages under the FLSA and NYLL as applicable," id. at 22-23. We believe these allegations were sufficient to alert defendants that plaintiffs were raising as an issue in the case that defendants' failure to pay minimum wage could not be justified on the basis that defendants properly provided notice to plaintiffs of their intention to take a tip credit.

More importantly, even though it was clear long before trial that the notice of tip credit issue was to be part of this case, defendants made no objection to the inclusion of this issue. The joint pretrial order listed as an issue to be tried the defendants' failure to pay minimum wage, see Joint Pretrial Order, filed Aug. 26, 2016 (Docket # 44), at 2-3 — a failure that defendants could justify only by meeting their burden of proof that they had fulfilled all the prerequisites of claiming a tip credit, including the notice requirement. The plaintiffs' proposed findings of fact and conclusions of law, filed months before trial, described the tip credit notice claims in detail and at length both under the FLSA and NYLL. See Pls. Pre-trial Mem. at 10-12. Defendants never objected to plaintiffs' express plan to raise this issue at trial. At trial itself, plaintiffs' counsel elicited from plaintiffs testimony on whether they had been told about a tip credit being taken and also questioned Garzon about the same issue — all without any objection from defendants as to relevance. (Tr. 17, 42, 89). Following the conclusion of the bench trial, the Court specifically noted, and defense counsel acknowledged, that whether notice had been given

regarding the tip credit was an issue in the case. (Tr. 116-17). Indeed, defendants indicated at that time that they would argue that the pay stubs constituted the notice and would brief that issue. (Tr. 117).[7] Thus, putting aside the question of whether the issue was raised in the complaint, defendants impliedly consented to the issue being raised at trial. Under Federal Rule of Civil Procedure 15(b)(2), "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Courts have found implied consent in situations where, notwithstanding a claim's absence from the governing pleading, the opposing party made no objection to the claim's inclusion in pretrial materials. See, e.g., Putz v. Golden, 2012 WL 2565017, at *22 n.6 (W.D. Wash. July 2, 2012); Wildwood Indus. v. Genuine Mach. Design, 587 F. Supp. 2d 1035, 1053 (N.D. Ind. 2008).

In sum, for the reasons stated above, plaintiffs are entitled under the FLSA and the NYLL to the difference between the minimum wage and the wage they were actually paid for the period of their employment to which the statute of limitations applies. See, e.g., Changxing Li v. Kai Xiang Dong, 2017 WL 892611, at *5 (S.D.N.Y. Mar. 7, 2017) ("Defendants here were not entitled to take credit under the FLSA or NYLL since defendants did not advise plaintiffs of their right to an undiminished wage if their tips fell short of the tip credit taken, or of their right to be paid the minimum wage; nor did defendants provide plaintiffs with written notice of the tip credit at all, let alone in . . . their native language. Consequently, plaintiffs are entitled to unpaid minimum wages at the full minimum wage rate.") (internal citation omitted). The issue of the

---

      [7] In fact, defendants never did so. They argued merely that the sum of "the tips earned by Plaintiffs, when added to their hourly wage, indicated a wage rate equal to or exceeding" the minimum wage. See Defs. Mem. at 14-15. No attempt was made to show that the notice requirement was met.

statute of limitation is discussed in section III.E below.[8]

B.  Overtime Wage Claims

    1.  Improper Wages

Both the FLSA and NYLL require that a covered employee be paid no less than one and one-half times their regular rate of pay for hours worked in excess of 40 per week.  29 U.S.C. § 207(a); N.Y. Comp. Codes R & Regs. tit. 12, § 142-2.2 (using the same definition of overtime as the FLSA); accord Domenech v. Parts Auth., Inc., 653 F. App'x 26, 27 (2d Cir. 2016) (summary order); Nakahata v. New York-Presbyterian Healthcare Sys., Inc., 723 F.3d 192, 200 (2d Cir. 2013).  As noted above, we accept that defendants' time records are accurate, and that plaintiffs were paid for the overtime hours they worked.

However, the rate at which plaintiffs were paid overtime was one and one-half times the "tip credit" rate, which, as we have just explained, defendants were not entitled to use.  As was true for the base hourly wage, defendants were not entitled to take a "tip credit" off plaintiffs' overtime hourly wage because they failed to provide plaintiffs with notice they were doing so. See, e.g., Inclan, 95 F. Supp. 3d at 500 (defendants not entitled to tip credit allowance on overtime wage for failure to provide plaintiffs proper notice).  Defendants are thus liable for the difference between the full overtime rate (i.e. one and one-half times the minimum wage for the relevant years) and the amount plaintiffs actually received for their overtime hours worked.[9]

---

[8]  Because defendants are not eligible for a "tip credit" against the minimum wage in light of their failure to provide plaintiffs with proper notice, we need not decide whether defendants were entitled to take a "tip credit" based on the time per shift plaintiffs performed non-tipped work.

[9]  Even if defendants had notified plaintiffs that they were taking a "tip credit," they still would be liable to plaintiffs for unpaid overtime wages because they deducted a tip credit from their wage before calculating the time-and-a-half-rate instead of after.  See, e.g., Inclan, 95 F.

2. <u>Spread of Hours Pay</u>

In addition to unpaid overtime wages, plaintiffs argue that they were entitled to "spread of hours" pay. New York law requires, separate from any unpaid minimum wage or overtime award, that "an employee whose workday is longer than ten hours must receive one hour's pay at the basic minimum hourly wage rate." <u>Galeana v. Lemongrass on Broadway Corp.</u>, 120 F. Supp. 3d 306, 319 (S.D.N.Y. 2014) (internal quotation marks omitted) (quoting N.Y. Comp. Codes R & Regs. tit. 12, § 142-2.4; and <u>Ke v. Saigon Grill, Inc.</u>, 595 F. Supp. 2d 240, 260 (S.D.N.Y. 2008)). This time is measured as "the interval between the beginning and end of an employee's workday." N.Y. Comp. Codes R & Regs. tit. 12, § 142-2.18; <u>accord</u> <u>Martinez v. Hilton Hotels Corp.</u>, 930 F. Supp. 2d 508, 531 (S.D.N.Y. 2013). Thus, breaks, lunch periods, "split shifts,"[10] and other non-working time on premises count as part of the "workday" for this provision's requirements. N.Y. Comp. Codes R & Regs. tit. 12, §§ 142-2.4, 142-2.18.

Here, while Garzon did not remember the exact shifts that plaintiffs worked, he testified that the shifts were normally from 10:00 a.m. to 2:00 or 3:00 p.m., then from 5:00 p.m. to 9:00 or 10:00 p.m. (Garzon: Tr. 108-10). He also said that most of the delivery workers would have a break of two hours or more (Garzon: Tr. 110), and that plaintiffs would normally "clock out" during that break (Garzon: Tr. 93-94). Thus, even when not working overtime, plaintiffs would

_____

Supp. at 499 (finding that overtime payment at $5 for base pay and $7.50 for overtime was improper; restaurant should have multiplied minimum wage by one and one-half, then subtracted the tip credit); <u>see also</u> N.Y. Comp. Codes R & Regs. tit. 12, § 146-1.4 ("It is a violation of the overtime requirement for an employer to subtract the tip credit first and then multiply the reduced rate by one and one half.").

[10] "A split shift is a schedule of daily hours in which the working hours required or permitted are not consecutive," and where the "split" is greater than one hour. N.Y. Comp. Codes R & Regs. tit. 12, § 142-2.17 (emphasis omitted).

begin work around 10:00 a.m. and finish around 9:00 p.m. — a "split shift" of 11 hours.

Accordingly, plaintiffs are entitled to one extra hour of pay per day at the regular minimum wage rate as unpaid "spread of hours" pay for each day on which they worked.

C. <u>NYLL Notices Claims</u>

1. <u>Section 195(1) Notices</u>

NYLL section 195(1) requires that, both at the time of hiring and annually through December 28, 2014, an employer "provide his or her employees, in writing in English and in the language identified by each employee as [their] primary language," notice of

> the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular pay day designated by the employer in accordance with section one hundred ninety-one of this article; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary.

NYLL § 195(1)(a); <u>accord</u> <u>Franco v. Jubilee First Ave. Corp.</u>, 2016 WL 4487788, at *13 (S.D.N.Y. Aug. 25, 2016). The notice must also state an employee's regularly hourly rate and overtime rate of pay. NYLL § 195(1)(a). Statutory damages apply to those employers who fail to comply with this provision. <u>See</u> <u>id.</u> § 198(1-b).

However, this provision did not take effect until April 9, 2011. <u>See</u>, <u>e.g.</u>, <u>Franco</u>, 2016 WL 4487788, at *13 ("Employees who began working before . . . April 9, 2011, however, are not entitled to bring a claim for an employer's failure to provide notice as required under NYLL § 195(1)(a)."). Here, Cid began working for Hakata in September 2008. (Cid: Tr. 8). Valle began working there in October 2010. (Valle: Tr. 37). Because they began their employment before April 9, 2011, they cannot raise claims under section 195(1). <u>See</u>, <u>e.g.</u> <u>Franco</u>, 2016 WL

17

4487788, at *13 (collecting cases).

2. Section 195(3) Pay Stubs

NYLL section 195(3) requires that employers

> furnish each employee with a statement with every payment of wages, listing the
> following: the dates of work covered by that payment of wages; name of
> employee; name of employer; address and phone number of employer; rate or
> rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary,
> piece, commission, or other; gross wages; deductions; allowances, if any, claimed
> as part of the minimum wage; and net wages.

NYLL § 195(3). The statements must also include, where applicable, the employee's "regular

hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked,

and the number of overtime hours worked." Id. The penalty for violating this statute is $250 per

work day, not to exceed $5,000. NYLL § 198(1-d).

Garzon testified that the plaintiffs received the pay statements that were admitted into

evidence. (Garzon: Tr. 76-80). The plaintiffs themselves never denied receiving such

statements; indeed, Cid testified that they received some kind of paper with their paychecks.

(Cid: Tr. 30-32).[11] Thus, we find that the stubs in evidence were given to plaintiffs. In their pre-

or post-trial submissions, plaintiffs do not argue that these statements fail to include the elements

required by statute. Accordingly, plaintiffs cannot prevail under NYLL § 195(3).

D. Other Claims in Complaint

Plaintiffs' complaint raises other grounds for damages, including claims of allegedly

unlawful deductions from plaintiffs' wages for meals and equipment. See Compl. ¶¶ 134-142.

Plaintiffs failed to marshal evidence on these claims in their pre-trial submissions, however, and

---

[11] Valle testified that he did not remember if anything was attached to the checks he
received. (See Valle: Tr. 51-52).

18

thus they cannot recover for them.

    E.  <u>Statute of Limitations</u>

As discussed above, the claims on which plaintiffs have prevailed are (1) their claims under the FLSA and the NYLL that the defendants improperly paid them at a tip credit rate instead of at the appropriate minimum wage or overtime wage; and (2) their claim under the NYLL for "spread of hours" pay.

Any claim under the FLSA for unpaid minimum wages, unpaid overtime, or liquidated damages must be brought within two years after the cause of action accrued, or three years if the violation was willful.  29 U.S.C. § 255(a).  An action accrues for purposes of the FLSA "on the next regular payday following the work period when services are rendered" and required compensation is not paid.  <u>Nakahata</u>, 723 F.3d at 198 (citing 29 C.F.R. § 790.21(b)).  A violation is "willful" if the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  <u>McLaughlin v. Richland Shoe Co.</u>, 486 U.S. 128, 133 (1988); <u>accord</u> <u>Kuebel v. Black & Decker, Inc.</u>, 643 F.3d 352, 366 (2d Cir. 2011).  However, "[i]f an employer acts unreasonably, but not recklessly, in determining its legal obligation," it has not acted willfully.  <u>McLaughlin</u>, 486 U.S. at 135 n.13; <u>see also</u> <u>Parada v. Banco Industrial de Venez., C.A.</u>, 753 F.3d 62, 71 (2d Cir. 2014) ("If an employer acts unreasonably, but not recklessly, in determining its legal obligation, its action should not be considered willful.") (citation, alteration, and internal quotation marks omitted); <u>Young v. Cooper Cameron Corp.</u>, 586 F.3d 201, 207 (2d Cir. 2009) (a showing of "[m]ere negligence is insufficient" to establish willfulness); <u>Salinas</u>, 123 F. Supp. 3d at 477 (citing <u>Parada</u>, 753 F.3d at 71; and <u>Young</u>, 586 F. 3d at 207).

A claim under the NYLL must be brought within six years.  NYLL § 198(3); <u>accord</u>

Galeana, 120 F. Supp. 3d at 314.

Plaintiffs filed their complaint on March 17, 2015. They may thus bring any claims under the NYLL that accrued on or after March 17, 2009, and defendants are liable for the violations of NYLL that occurred on or after that date. As plaintiffs were paid weekly, they may only bring claims under the FLSA that accrued on or after March 17, 2013, or on or after March 17, 2012, if the violation was willful. Given that the defendants are liable for the same damages under either the NYLL or the FLSA, it is not necessary to reach the issue of whether the FLSA violation was willful.

     F.  Liquidated Damages

Plaintiffs' pre-trial memorandum requested liquidated damages for violations of the FLSA and NYLL, under 29 U.S.C. § 216(b) and NYLL § 198(1-a), respectively. Pls. Pre-trial Mem. at 13-14.

An employer who violates the minimum wage and overtime provisions of the FLSA is presumptively liable to the affected employees, in addition to back-pay, for 100% of the unpaid wages as liquidated damages. 29 U.S.C. § 216(b) ("Any employer who violates the provisions . . . of this title [relating to minimum wages and overtime compensation] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages."). However, the employer may escape liability for such liquidated damages if the employer demonstrates that his violation of the FLSA was committed "in good faith and that he had reasonable grounds for believing that his act or omission was not a violation" of the FLSA. Id. § 260; see also Brock v. Wilamowsky, 833 F.2d 11, 19 (2d Cir. 1987) ("Under [FLSA] § 260, the employer bears the burden of establishing the defense of good faith."). Here, defendants did

20

not present reasonable grounds for their belief that they were not in violation of the FLSA. Defendants argue that their actions were "indicative of at least attempting to comply with all Federal and New York state wage laws and notice requirements," Defs. Pre-trial Mem. at 4, but did not provide evidence at trial to support a finding that they could have reasonably believed that there was no requirement in the law that they give notice of the tip credit.  Although Wartski confirmed that he "consulted with professionals concerning [his] obligations concerning payroll" (Wartski: Tr. 112), he did not discuss what advice he specifically received regarding the FLSA obligations, nor why it would have been objectively reasonable for him to believe that he did not have to provide his employees with notice regarding the tip credit.  Because defendants could not have reasonably believed that failing to provide the notice explicitly demanded by the FLSA, see 29 U.S.C. § 203(m), would not be a violation of the FLSA, they are liable for liquidated damages.

NYLL also provides for liquidated damages "unless the employer proves a good faith basis for believing that its underpayment of wages was in compliance with the law."  NYLL § 198(1-a).  As was true for the FLSA, the defendants have not shown why they had a basis for their belief that they were not required to comply with NYLL's explicit notice requirement or with their obligation to make "spread of hours" payments.

As for the amount of liquidated damages, we note that plaintiffs may recover under the NYLL for claims accruing on or after March 17, 2009.  However, before November 24, 2009, a plaintiff was only entitled to liquidated damages if he or she could prove "that the employer's failure to pay the wage required by [article 6 of the NYLL] was willful."  Inclan, 95 F. Supp. 3d at 504 (alteration in original) (internal quotation marks omitted) (quoting NYLL § 198(1-a) (version effective prior to Nov. 23, 2009)).  The meaning of "willfulness" under the NYLL does

not appreciably differ from "willfulness" under the FLSA's statute of limitations.  Kuebel, 643 F.3d at 366; accord Inclan, 95 F. Supp. 3d at 504-05.  We do not find that plaintiffs have shown that defendants acted wilfully, however.  Wartski credibly affirmed at trial that he had "consulted with professionals concerning [his] obligations concerning payroll."  (Wartski: Tr. 112).  It thus appears defendants' failure stemmed from their ignorance of this provision, not from an intentional disregard of its requirement.  Indeed, given defendants' attempts to comply with other NYLL provisions, it would have been quite a simple matter to provide the required notice, and no benefit to defendants to intentionally not provide it.  Courts have found conduct similar to defendants' as reflecting negligence rather than recklessness.  See, e.g., Mould v. NJG Food Serv. Inc., 37 F. Supp. 3d 762, 773 (D. Md. 2014) ("In availing themselves of the tip credit allowed by the FLSA but failing to determine whether any legal conditions needed to be satisfied prior to taking such a tip credit, Defendants' conduct was unreasonable but falls short of the recklessness required for the Court to find that their violation . . . was willful.").

Because defendants did not willfully violate the NYLL, plaintiffs are not entitled to liquidated damages before November 24, 2009.

They are entitled to liquidated damages on their NYLL claims that accrued from November 24, 2009, to March 17, 2015, however.  Those damages are 25% of the unpaid wages for claims that accrued from November 24, 2009, until April 8, 2011, and 100% of the unpaid wages from April 9, 2011, to March 17, 2015.  Inclan, 95 F. Supp. 3d at 505 (citing NYLL § 198(1-a) as amended before and after Apr. 9, 2011); accord Chowdhury v. Hamza Express Food Corp., 666 F. App'x 59, 60 (2d Cir. 2016) (summary order) (NYLL was amended "in 2010 to increase the amount of liquidated damages from twenty-five percent to one-hundred percent of the total wages due").

Plaintiffs request "both FLSA and NYLL liquidated damages for overlapping periods of time" — i.e. from March 17, 2012, or March 17, 2013, to March 17, 2015, depending on whether the FLSA violation was willful.  See Pls. Pre-trial Mem. at 14.  We reject this request as it would lead to duplicative damages.  See Chowdhury, 666 F. App'x at 61 ("[W]hatever reasons existed to award liquidated damages under the relevant provisions of both the FLSA and the NYLL before 2010, we read the subsequent amendments to the NYLL provision, which brought it into substantial conformity with the FLSA provision, as having eliminated those reasons."); Cabrera v. 1560 Chirp Corp., 2017 WL 1289349, at *8 (S.D.N.Y. Mar. 6, 2017) ("Subsequent to the Second Circuit's decision in Chowdhury, courts have declined to award cumulative liquidated damages for unpaid wages on or after April 9, 2011, the effective date of the second amendment to the NYLL . . . .") (collecting cases); Diaz v. AJE Mgmt. Corp., 2017 WL 746439, at *4 (S.D.N.Y. Jan. 10, 2017) (noting that Chowdhury is non-precedential, but following its guidance in not awarding double liquidated damages); Santana v. Brown, 2015 WL 4865311, at *5 (S.D.N.Y. Aug. 12, 2015) ("The changes in the NYLL's liquidated damages provision have rendered any distinction between the [FLSA and NYLL liquidated damages] largely illusory.").

G.  Amount of Judgment

Although plaintiffs proposed damages findings in their pre-trial submissions, Damages Chart (attached as Ex. A to Pls. Pre-trial Mem.), the chart assumes that plaintiffs consistently worked 50 hours per week during their employment period, a contention not supported by the evidence at trial.  Plaintiffs have not revised these calculations post-trial, and defendants have submitted no damages calculation.

Accordingly, the parties are directed to submit for the Court's consideration a proposed calculation of damages based on the findings in this Opinion and Order.  If the parties cannot

agree on the damages calculation, they may submit competing proposals. The Court will thereafter enter judgment.

## IV. CONCLUSION

For the foregoing reasons, plaintiffs are entitled to judgment against defendants for violating the FLSA and NYLL.[12] Plaintiffs shall supply to defendants within 14 days of the date of the date of this Opinion and Order their proposal for calculation of damages. The parties' final proposal (or proposals) shall be filed within 7 days thereafter.

SO ORDERED.

Dated: June 5, 2017
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

---

[12] Defendants do not contest that each of the defendants is liable for the violations alleged. Thus, plaintiffs are entitled to a judgment against all defendants and the defendants are jointly and severally liable for the judgment. See Irizarry v. Catsimatidis, 722 F.3d 99, 103-07, (2d Cir. 2013); accord Inclan, 95 F. Supp. 3d at 507, 510-11.